# CRIMINAL CASES.

## Wytheville.

### FLYNN BROWN V. COMMONWEALTH.

#### June 29, 1921.

1. ACCOMPLICES AND ACCESSORIES—*Principal in Second Degree—Case at Bar.*—In the instant case, from the standpoint of the Commonwealth, the evidence showed that defendant had a difficulty with one W, and some hours afterwards determined to go back "to get satisfaction about the way he was treated, and, if he found out that he was in the right, he was going to fight" W. On his way back he met his brother and nephew, who, upon learning his purpose, joined him. Upon reaching W's house, the party immediately attacked him, and while defendant had hold of W, his brother fired two shots, hitting W and an innocent bystander. Defendant then assisted his brother in getting over a fence to make his escape. It did not appear that defendant was armed or knew that his brother was armed, and there was no evidence of an original design to shoot W.

   *Held:* That the jury was justified in finding the defendant guilty, as a principal, in the second degree.

2. ACCOMPLICES AND ACCESSORIES—*Principal in Second Degree—Aiders and Abettors.*—A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance.

3. ACCOMPLICES AND ACCESSORIES—*Principal in Second Degree—Aiders and Abettors.*—While every person who is present at the commission of a trespass encouraging, inciting, or by any means countenancing or approving the same is an aider or abettor, mere presence when a crime is committed is, of course, not sufficient to render one guilty as an aider or abettor. There must be something to show that the person present, and so charged, in some way procured, or incited, or encouraged, the act done by the actual perpetrator.

4. ACCOMPLICES AND ACCESSORIES—*Principal in Second Degree—Aiders and Abettors—Circumstantial Evidence.*—Whether a person does in fact aid or abet another in the commission of a crime is a question which may be determined by circumstances as well as by direct evidence.

5. ACCOMPLICES AND ACCESSORIES—*Principal in Second Degree—Aiders and Abettors—Design.*—All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime.

Error to a judgment of the Corporation Court of the city of Norfolk.

*Affirmed.*

The opinion states the case.

*Wm. McK. Woodhouse* and *J. M. Harris,* for the plaintiff in error.

*John R. Saunders, Attorney General; J. D. Hank, Jr., Assistant Attorney General,* and *Leon M. Bazile, Second Assistant Attorney General,* for the Commonwealth.

KELLY, P., delivered the opinion of the court.

Flynn Brown was indicted and tried under two indictments, one charging him with unlawfully, maliciously and feloniously shooting Leroy White, with intent to maim, disfigure, disable and kill, and the other charging him with likewise shooting Hampton Taylor. These two charges against him were, by consent, heard together. The jury found him guilty of a felony upon the first indictment, fixing his punishment at confinement in the penitentiary for one year, and also found him guilty of a simple assault upon the second indictment, fixing his punishment at confinement in jail for thirty days. The trial court overruled a motion for a new trial, and sentenced the defendant in accordance with the verdicts.

The sole error assigned is that the verdicts were not supported by the evidence.

The defendant did not do the shooting, but the Commonwealth contended below, and contends here, that he was present, aiding and abetting the crime, and that therefore he was guilty as a principal in the second degree.

[1] From the standpoint of the Commonwealth, the evidence either showed or materially tended to show the following facts: On the 21st of June, 1920, about one o'clock p. m., the defendant, who was intoxicated, went to the house of Leroy White (a house of bad repute) and asked if a certain girl named Lucy was there. An altercation arose between Brown and White which resulted in White's pushing or throwing Brown out of the door and into the street so violently that he fell to the ground. After getting up he said to White: "When I come back, you will not stay here any longer," and then went away. Some hours later, and after the defendant had somewhat recovered from his intoxication, "he got to thinking," as he said, "about how badly White had treated him, and got very hot" and determined to go back "to get satisfaction about the way he was treated, and if he found out he was in the right, he was going to fight White about it." He left home alone, and on the way to White's house met up with his brother, Moses Brown, and his nephew, James Brown. They asked where he was going, and when he informed them of the occasion and purpose of his mission, they offered to go with him. It does not appear that he was armed or that he knew his brother was armed, and he had no gun and said he did not know his brother had one. The party arrived at White's house about five o'clock p. m. White was sitting at the window near the door. No one else was in the room except a girl. The defendant looked through the window and said to Moses and James Brown: "There is the s— of a b— now," and knocked at the door. White came to the

door, and the defendant immediately seized and pulled him into the street. James Brown said: "Punch the s— of a b— in the mouth," and also said: "Kill him," or "Kill the s— of a b—:" and Moses Brown fired two shots, one while the defendant had hold of White, which did not take effect on White, but struck Hampton Taylor, an innocent bystander, and one after White had broken away and was going up the stairway in his house. The second shot struck White in the back. Moses Brown then made his escape, going over a fence, which he was assisted in getting over by the defendant, Flynn Brown.

This narrative of occurrences is, in some important particulars, at variance with the testimony on behalf of the defendant, but is fully warranted by that portion of the evidence which the jury evidently accepted as true. It was their province to settle the conflicts in testimony.

[2] We have no difficulty in holding that the jury was justified in finding the defendant guilty as a principal in the second degree.

"A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance." Minor's Synopsis Crim. Law, p. 11. See also *Horton's Case,* 99 Va. 848, 38 S. E. 184.

[3-4] "Every person who is present at the commission of a trespass, encouraging or inciting the same by words, gestures, looks or signs, or who in any way, or by any means, countenances or approves the same, is, in law, assumed to be an aider and abettor, and is liable as principal." Plaintiff's Instr. No. 1 in *Dangerfield* v. *Thompson,* 33 Gratt. (74 Va.) 136, 148, 36 Am. Rep. 783, approved by this court as the law.

Mere presence when a crime is committed is, of course, not sufficient to render one guilty as an aider or abettor. There must be something to show that the person present and so charged, in some way procured, or incited, or encour-

aged, the act done by the actual perpetrator. *Kemp's Case,* 80 Va. 443, 450. But whether a person does in fact aid or abet another in the commission of a crime is a question which may be determined by circumstances as well as by direct evidence. In this case, Moses Brown, the acknowledged principal in the first degree, would not have been present at all but for the fact that he had learned from Flynn Brown of the unlawful mission on which the latter, the real aggressor, was going to the place. They both undoubtedly went there with a common unlawful purpose, for which the defendant was primarily responsible. The fight would have been unlawful, even if he had first sought an explanation, and had attacked White only after satisfying himself that he had been unjustly treated; but his testimony that he only intended to make the attack if he found out he was in the right, is discredited by the Commonwealth's evidence tending to show that he assaulted White immediately and without asking any questions. Furthermore, the fact that the shooting began, according to the Commonwealth's evidence, almost simultaneously with Flynn Brown's assault upon White, and the further fact that as soon as the second shot was fired Moses Brown was assisted by Flynn Brown in getting over the fence to make his escape, are very significant circumstances, when viewed in the light of the previous concert of action by these two men in coming to White's house to demand satisfaction.

It may be conceded that there is no sufficient evidence to show that it was a part of the original plan or design of these parties to shoot White. Such a concession does not avail anything to the defendant. What actually occurred was not an improbable consequence of the fight which they clearly intended to provoke. When two or more persons go to the home of a third party to whip him, they know he will in all reasonable probability use force in resisting the

attack, and that bloodshed is likely to result on one or both sides.

[5] In 1 Wharton's Criminal Law (11th ed.), sec. 258, pp. 329, 330, it is said: "All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime. * * * Hence, it is not necessary that the crime should be a part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose." See also, *Martin* v. *State,* 89 Ala. 115, 120, 8 So. 23, 18 Am. St. Rep. 91; *Peden* v. *State,* 61 Miss. 267, 270; *People* v. *Vasquez,* 49 Cal. 560, 563; *State* v. *Darling,* 216 Mo. 450, 115 S. W. 1002, 23 L. R. A. (N. S.) 273, 129 Am. St. Rep. 526, 13 R. C. L. p. 730, sec. 31.

In *Peden* v. *State, supra,* where several persons went to a man's house with the common purpose of whipping him, and one of the party struck him with a spade inflicting a fatal injury, it was held that the other members of the party were responsible for the act and properly convicted of murder, although the evidence tended to show that the death of the deceased was not a part of the original plan. The court said: "The fatal blow was struck by Amos Davis, one of the party, with a spade. The evidence suggests that the death of Walker was not contemplated by the parties at the outset, and that their purpose was bounded by the flogging of Walker. A number of persons having conspired together to do the unlawful act of beating Walker, the law makes no distinction between them, and each is responsible for the act of any of the party in the prosecution of the design, and if death happened in the prosecution of such design, all are guilty of murder, if the person who caused

the death is. It matters not that the purpose to kill Walker was not entertained by all or any at the outset."

In *State* v. *Darling, supra,* the defendant accompanied his brother to be present when the latter whipped the deceased. It did not appear that the defendant knew his brother had, or intended to use, any weapons. When the attack was made, however, the brother used a piece of iron, and inflicted fatal injuries. The court reviewed the authorities on the subject somewhat fully, and in the course of the opinion said: "As said by the Alabama Supreme Court *(Williams* v. *State,* 81 Ala. 1, 60 Am. Rep. 133), the defendant knowing of this purpose (to assault and whip the deceased without any agreement or limitation affecting the method to be used in whipping him), and going along to assist in it, could expect nothing else than that the deceased would naturally oppose force to such unlawful design upon his person, as the experience of mankind shows that very few men would tamely submit to such an outrage and indignity, and a natural and probable consequence of such an encounter would be homicide, either of the deceased or of one of them. And the law will hold him responsible for the act of his brother. Most of the adjudicated cases hold that he would be guilty of murder in such a case, and he has no cause to complain that the court limited his offense to manslaughter."

*Kemp's Case, supra,* and *Reynolds' Case,* 33 Gratt. (74 Va.) 834, are relied upon by the defendant, but they do not support his defense.

In *Kemp's Case,* this court approved the following quotation from 1 Bishops' Cr. Law, sec. 634: "From the proposition that mere presence at the commission of a crime does not render a person guilty, it results that if two or more are lawfully together, and one does a criminal thing without the concurrence of the others, they are not thereby involved in guilt. But however lawful the original coming

together, the after conduct may satisfy a jury that all are guilty of what is done."

In the case at bar, however, "the original coming together" was *unlawful* and furthermore, "the after conduct" of the defendant in immediately assisting Moses Brown to escape tended to show that both were guilty of the shooting.

The following further extract from the opinion in *Kemp's Case* shows that case to have been essentially different from this one: "In all the evidence in this case (and there is no conflict of evidence in any respect), there is not a circumstance disclosed tending in the least to show any agreement or formed design between the prisoner, Kemp, and the man, Whitehurst, who did the killing, nor between him and any other person or persons, nor that he in any manner aided or abetted in, or assented to, the felonious act of Whitehurst, the sole perpetrator thereof; nor was there a moment of time in which there could have been an agreement between the real perpetrator and the prisoner. Nor is there an intimation of any agreement or design on the part of the prisoner to commit any other unlawful purpose. The testimony establishes nothing but mere presence. The meeting of the parties who were present at this tragedy was purely accidental."

In the *Reynolds Case, supra,* there was no evidence of a prearranged plan to attack the deceased.

The trial court was right in refusing to set aside the verdicts, and the sentences passed upon the defendant are affirmed.

*Affirmed.*