## Richmond

MICHAEL DUANE ROLLSTON

v.

COMMONWEALTH OF VIRGINIA

No. 0245-89-2

Decided January 2, 1991

COUNSEL

Thomas P. Collins (Eck, Lewis, Anderson & Collins, on brief), for appellant.

Thomas D. Bagwell, Assistant Attorney General (Mary Sue Terry, Attorney General; David A. Rosenberg, Assistant Attorney General, on brief), for appellee.

OPINION

**COLE, J.**—Michael Duane Rollston was convicted of two counts of first degree murder as a principal in the second degree and two counts of use of a firearm in commission of the murders. He was sentenced to a total of forty-six years with nine years suspended. On appeal, he contends that the trial court erred in granting the jury instructions concerning concert of action and principal in the second degree and that the evidence was insufficient to sustain the first degree murder and firearm convictions. Finding that the instructions were proper and the evidence sufficient to support the convictions, we affirm.

After John Bondurant's home had been broken into several times and property stolen, he and a friend, Ben Shumaker, began collecting information concerning Keith Mittelstadter and Michael Rollston, the defendant, to give to the police. Bondurant and Ben Shumaker provided Detective Bateman with detailed information concerning Mittelstadter and Rollston, including the type of activities that they were involved in. They also gave Bateman the address of a vacant house on Mill Road where they

suspected some of Bondurant's stolen goods were being stored.

During the early morning hours of February 17, John Bondurant and Brian Shumaker were shot and killed in Bondurant's house. Brian Shumaker was the brother of Ben Shumaker, who together with John Bondurant, had given information to Detective Bateman concerning the defendant and Mittelstadter. Each had been shot once in the head. Rollston was convicted of all four charges against him and this appeal followed.

The trial court granted Instruction No. 12 over the defendant's objection. It provides:

> A principal in the first degree is the person who actually commits the crime. A principal in the second degree is a person who is present, *sharing the criminal intent of the perpetrator or* aiding and abetting, by helping in some way in the commission of the crime. Presence or consent alone is not sufficient to constitute aiding and abetting. It must be shown that the defendant intended his words, gestures, signals or actions to in some way encourage, advise, or urge, or in some way help the person committing the crime to commit it.
>
> A principal in the second degree is liable for the same punishment as the person who actually committed the crime. The Commonwealth must prove beyond a reasonable doubt that the defendant is a principal in the second degree.
>
> If you find the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of the offense, then you shall find the defendant not guilty.

(emphasis added). This instruction is the standard principal in the second degree instruction found in 1 *Virginia Model Jury Instructions, Criminal*, No. 3.100 (1989), with the addition of the words, "sharing the criminal intent of the perpetrator or." This additional language was added by the trial judge at the suggestion of the defendant.

The Commonwealth and Rollston agree that the charges against Rollston were prosecuted under the theory that he was a principal in the second degree. They further agree that two first degree murders occurred and murder, except felony murder, is a specific intent crime. Rollston consistently took the position during

the trial, as he does before us, that to convict him, the Commonwealth was required to prove that he shared the specific intent to murder. The Commonwealth, on the other hand, takes the position that the standard of proof is shared specific intent or some overt act. The defendant contends that no disjunctive instruction, as given in this case, is permitted in principal in the second degree to first degree murder cases. He argues that since Instruction No. 12 was clearly in the disjunctive, it was an incorrect statement of law and prejudicial to the defendant.

 "A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance." *Brown v. Commonwealth*, 130 Va. 733, 736, 107 S.E. 809, 810 (1921). As for what constitutes "aiding and abetting," it is clear that mere presence and consent will not suffice. *E.g., Underwood v. Commonwealth*, 218 Va. 1045, 1048, 243 S.E.2d 231, 233 (1978). The defendant's conduct must consist of "inciting, encouraging, advising or assisting in the murder." *Frye v. Commonwealth*, 231 Va. 370, 389, 345 S.E.2d 267, 280 (1986). It must be shown that the defendant procured, encouraged, countenanced, or approved commission of the crime. *Augustine v. Commonwealth*, 226 Va. 120, 124, 306 S.E.2d 886, 888-89 (1983). "To constitute one an aider and abettor, he must be guilty of some overt act, or he must share the criminal intent of the principal." *Triplett v. Commonwealth*, 141 Va. 577, 586, 127 S.E. 486, 489 (1925); *see also Moehring v. Commonwealth*, 223 Va. 564, 567, 290 S.E.2d 891, 892 (1982). One commentator has explained *Triplett* as follows:

> When the alleged accomplice is actually present and performs overt acts of assistance or encouragement, he has communicated to the perpetrator his willingness to have the crime proceed and has demonstrated that he shares the criminal intent of the perpetrator. When the alleged accomplice is actually present, but performs no overt act, he is nonetheless a principal in the second degree if he has previously communicated to the perpetrator that he shares the perpetrator's criminal purpose.

R. Groot, *Criminal Offenses and Defenses in Virginia* 183 (1984). This communication of shared intent makes the perpetrator more likely to act. *Id.; see also*, Perkins, *Parties to Crime*, 89 U. Pa. L.

Rev. 581, 600 (1941).

██ Thus, to prove defendant was an aider and abettor, "the evidence must show that [the defendant] was not only present but that [the defendant] procured, encouraged, countenanced, or approved commission of the crime. In other words, [the defendant] must share the criminal intent of the party who actually committed the [crime] or be guilty of some overt act in furtherance thereof." *Augustine*, 226 Va. at 124, 306 S.E.2d at 888-89; *see also Sutton v. Commonwealth*, 228 Va. 654, 666, 324 S.E.2d 665 (1985); *Hall v. Commonwealth*, 225 Va. 533, 536, 303 S.E.2d 903, 904 (1983).

The defendant offered Instruction A defining a principal in the second degree. Instruction A stated that in order to convict the defendant, the Commonwealth must prove, among other things, "that the defendant shared the criminal intent to murder the victims with the person or persons who actually committed the murders." The defendant based this instruction on *Hall v. Commonwealth*, which recites the language of *Triplett* that a principal in the second degree must share the criminal intent of the perpetrator or be guilty of some overt act. 225 Va. at 536, 303 S.E.2d at 904. Rather than giving Instruction A, the court inserted the phrase "sharing the criminal intent of the perpetrator" into the model instruction. The court did not insert "or be guilty of some overt act," but stated instead: "The overt act is aiding and abetting, so I'm not going to repeat that."

 Specific intent is not required to convict the defendant as a principal in the second degree. The defendant relies on the comment to Model Instruction 3.100 for the proposition that a principal in the second degree to murder must possess the specific intent to kill. This comment states that since murder in the first degree involves specific intent to kill and the principal in the second degree must share the criminal intent, "[i]t would seem therefore that the defendant must have the intent to have the victim killed." 1 *Virginia Model Jury Instructions, Criminal*, No. 3.100, I-51 (1989). However, "share the criminal intent" has been interpreted to mean that "the accused must either know or have reason to know of the principal's criminal intention and must intend to encourage, incite, or aid the principal's commission of the crime." *McGhee v. Commonwealth*, 221 Va. 422, 427, 270 S.E.2d 729, 732 (1980); *Cirios v. Commonwealth*, 7 Va. App. 292, 298, 373

S.E.2d 164, 167 (1988) (both applying the same standard to accessory before the fact in murder convictions). In addressing the *mens rea* requirement, other cases simply state that the defendant must intend his actions "to in some way encourage, advise, or urge, or in some way help the person committing the crime to commit it." *E.g., Ramsey v. Commonwealth*, 2 Va. App. 265, 269, 343 S.E.2d 465, 468 (1986). Neither approach requires that the defendant have the specific intent to commit the crime. The defendant attacks the instruction because it allows the defendant to be convicted of a specific intent crime without having the specific intent to kill. However, an abettor can be charged with specific intent where he or she gives encouragement knowing that the perpetrator has the intent to kill. Perkins, *Parties to Crime, supra*, at 601. Also, it is by legislative authority that principals in the second degree are punished as principals in the first degree. Code § 18.2-18.

It is the duty of the jury to consider the instructions as a whole and in the light of the evidence applicable to the issues presented. Although it may have been better if the trial court had used the language of the model instruction, we do not find that the jury could have been misled by Instruction No. 12. It is clear from the instruction that, whether Rollston shared in the criminal intent of the perpetrator or aided and abetted him, it was necessary that the jury find that he did so by "helping in some way in the commission of the crime." The instruction further told the jury that presence or consent alone was not sufficient, but the evidence must establish that the defendant "intended his words, gestures, signals or actions to in some way encourage, advise, or urge, or in some way help the person committing the crime." The trial court heard extensive argument from both counsel on this instruction. We concur with its decision to grant it.

The trial court granted Instruction No. 14 over the defendant's objection. This instruction was taken from the standard "concert of action" instruction in 1 *Virginia Model Jury Instructions* No. 3.160 (1989), which states as follows:

> If there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and

bound by the acts of every other person connected with the consummation of such resulting crime.

■ Concerted action is defined as "[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme." Black's Law Dictionary 262 (5th ed. 1979). As the definition indicates, concert of action in general terms need not be wrongful. If two people decide to have a meeting and then meet, there is concert of action. However, if one of the parties commits a criminal act during the meeting, the other is not criminally liable. Mere presence during the commission of a crime is not sufficient to render one criminally liable. *See, e.g., Hurd v. Commonwealth*, 159 Va. 880, 890, 165 S.E. 536, 540 (1932); *Brown v. Commonwealth*, 130 Va. 733, 736, 107 S.E. 809, 810 (1921); *Kemp v. Commonwealth*, 80 Va. 443, 450 (1885).

The early cases concerning concert of action make it clear that for an aider and abettor to be criminally liable for a principal's action, the original plan must be for a wrongful purpose. In *Brown v. Commonwealth*, the Supreme Court explained criminal concert of action as:

All those who assemble themselves together with *an intent to commit a wrongful act*, the execution whereof make probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime. . . . Hence, it is not necessary that the crime should be a part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose.

130 Va. at 738, 107 S.E. at 811 (quoting 1 *Wharton's Criminal Law* § 258, at 329, 330 (11th ed.)) (emphasis added);[1] *see also,*

---

[1] The latest edition of *Wharton's Criminal Law* states:
Where the crime committed is different from the crime counseled, there is no liability on the part of the aider and abettor, unless the crime committed was a natural and probable consequence of the crime counseled. Thus, a person counseling the commission of a robbery or arson may be liable for a homicide which occurs in the course of committing the counseled crime.
1 *Wharton's Criminal Law* § 35, at 181 (14th ed.).

*Carter v. Commonwealth*, 232 Va. 122, 126-27, 348 S.E.2d 265, 268 (1986); *Boggs v. Commonwealth*, 153 Va. 828, 836, 149 S.E. 445, 447 (1929)("everyone connected with carrying out a common design to commit a criminal act is . . . bound by the act of any member of the combination, perpetrated in the prosecution of the common design. But it is not necessary that the crime committed shall have been originally intended"); *Hurd*, 159 Va. at 892, 165 S.E. at 540 (to prove concert of action, there must be evidence of an unlawful enterprise); *Whited v. Commonwealth*, 174 Va. 528, 533, 6 S.E.2d 647, 649 (1939)("[c]oncert of action must be based upon a conspiracy to commit an illegal act").

The actual language of the concert of action instruction was first used in *Spradlin v. Commonwealth*, 195 Va. 523, 79 S.E.2d 443 (1954). The Supreme Court in *Spradlin* stated:

> If there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime. *The question of whether the offense is the natural and probable result of the intended wrongful act is usually for the jury.*

*Id.* at 528, 79 S.E.2d at 445 (emphasis added).

Later cases, *Westry v. Commonwealth*, 206 Va. 508, 514, 144 S.E.2d 427, 431 (1965), *Blevins v. Commonwealth*, 209 Va. 622, 627 n.2, 166 S.E.2d 325, 329 n.2 (1969), *Carter v. Commonwealth*, 232 Va. 122, 125, 348 S.E.2d 265, 267 (1986), as well as the concert of action instruction in this case, cite only the first sentence, leaving out the explanation that the concert of action must be to consummate a wrongful act.[2]

Contrary to Rollston's argument, the concert of action instruction can be used in cases other than felony murder. While a concert of action instruction may be proper in a felony murder case, it may also be proper to use when any unlawful enterprise is

---

[2] It should be noted, however, that in *Carter* the Court granted an additional concert of action instruction based upon *Wharton's Criminal Law* § 258 (11th ed.), which contained the statement that it is necessary that the parties come together with the intent to commit a wrongful act. 232 Va. at 126 n.2, 348 S.E.2d at 268 n.2.

intended. The intended wrongful act could be any crime and need not be a felony. The only qualification is that the resulting crime be an incidental, probable consequence of the original enterprise, plan or purpose. Under the Commonwealth's theory, Rollston, Mittelstadter and Walls planned the murders of Bondurant and Shumaker. This was the wrongful concerted action and Rollston was vicariously responsible under this principle for the firearm offenses. Even if he did not know that a firearm would be the murder weapon, he would be vicariously culpable for the firearm offenses because they were "incidental probable consequences" of the murders. Instruction No. 14 presented the Commonwealth's theory to the jury and we do not find the instruction to be improper.

■ Finally, Rollston contends that the evidence was insufficient to sustain the first degree murder convictions and the firearm convictions. We disagree. "When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom. The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it." *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988) (citations omitted).

When viewed in this light, John Bondurant's home was broken into several times and property was stolen. As a result, Bondurant and a friend, Ben Shumaker, began to collect information about the activities of Keith Mittelstadter and the defendant, Michael Rollston, to give to the police. On Sunday, February 14, 1988, Bondurant and Shumaker talked to Detective John Bateman and conveyed to him the information they had concerning both Mittelstadter and Rollston, including information about a house on Mill Road where the stolen property was being stored.

On Monday, February 15, 1988, Bateman located the house on Mill Road and determined that it belonged to Mittelstadter's grandmother, Marion Scott. On Tuesday, February 16, 1988, the police telephoned the owner and obtained permission to search the house. They entered it and found a number of items which they determined were stolen earlier that month in a burglary.

Marion Scott immediately told her daughter, Sandra Mills, with whom she lived, of the police phone call. Sandra called her sister, Betty Mittelstadter, who is the mother of Keith Mittelstadter, and told her about the police call and that permission had been granted to them to enter the Mill Road house. At approximately 3:00 a.m. on February 17, 1988, the Mill Road house caught fire and burned. The fire was deliberately set using a flammable liquid.

While these events were taking place concerning the Mill Road house, on Tuesday afternoon, February 16, 1988, Keith Mittelstadter, Danny Walls and Rollston were "riding around on the road" just talking. They decided to get some beer and go to Brian Shumaker's house. They arrived between 8:00 and 8:30 p.m. Rollston immediately left for about three hours. The other three talked, drank beer, and watched television until he returned about 11:20-11:25 p.m. according to the testimony of Shumaker's mother. Rollston picked up the other three and at 11:25 p.m. all four of them left, Rollston driving. Presumably, they left for the purpose of purchasing beer before the 7-11 store closed at midnight. Brian Shumaker called his mother on the telephone at 2:00 a.m. on February 17, 1988, to tell her that he was at John Bondurant's house and to inquire if anybody had called him. Within an hour after this telephone call was made, the Mill Road house was burned.

The next event definitely known is that at approximately 5:00 p.m. on the afternoon of February 17, 1988, Ben Shumaker, brother of Brian, and a friend went to John Bondurant's home. They found the door unlocked. Inside they found Bondurant and Brian Shumaker executed from a single gunshot wound to the head. What happened in the home can only be determined by statements made by Rollston and others to the police.

Lisa Morey, Rollston's former girlfriend, testified that Rollston called her at 7:10 a.m. the morning of February 17, 1988, and requested a meeting. They met and went for a ride. She further testified Rollston told her that Mittelstadter and Walls had done something he could not believe; that on the previous evening he had taken them to Bondurant's house and dropped them off; and that when he picked them up they told him they had "offed" two guys. Rollston went on to tell her he had returned to the house earlier that morning because he did not believe them; that he had

seen that the two guys were, in fact, murdered; that he thought they were killed because one of them was a narc or snitch on Mittelstadter; that he was not part of any plan to commit the murders; and that he had heard Mittelstadter and Walls saying they would like to kill Bondurant and Shumaker prior to dropping them off, but he thought they were just kidding. During this ride, Rollston picked up a gun and a knife from a ditch, stating, "This is the gun that . . . Danny and Keith said that they used to shoot them." Rollston threw the gun and knife off the Benjamin Harrison bridge in Hopewell.

Detective Jan Stem took statements from Rollston on three separate occasions. The first statement was taken at the Public Safety Building after the arrest of Mittelstadter on February 18, 1988. Rollston denied any knowledge of the murders. He stated that when he, Mittelstadter, Walls and Shumaker left Shumaker's house, they drove around and then he dropped Shumaker off at Bondurant's house. Then he took Walls home and Mittelstadter to his girlfriend's home. Rollston stated that the next morning he was with his girlfriend, Lisa Morey.

After this statement, Rollston was released and went to Mittelstadter's girlfriend's home. Mittelstadter called his girlfriend on the telephone and Rollston made the comment that he needed to talk to Mittelstadter to get his story straight. He then talked to Mittelstadter.

Meanwhile, the police interviewed Lisa Morey. Rollston repeatedly called her while the police were at her home, but she would not answer his calls. Later, he said that if she had answered his calls, he would have told her what to say. After interviewing Lisa Morey, the police arrested Rollston at his home where he denied any knowledge of the murders.

When they reached the Public Safety Building, the police taped the third and final interview with Rollston. Rollston said that around 11:30 p.m. on February 16, 1988, he drove Brian Shumaker, Mittelstadter and Walls to John Bondurant's house; that after all of them "went up to the door . . . Johnny [Bondurant] came to the door," and everyone went inside except for him; that he stayed outside to use the bathroom; that he drove off without his friends, went around the block, "parked my car, and I got out of the car, and then I seen Keith [Mittelstadter] and

Danny [Walls] coming down the road;" that they got in the car and said that they had "offed" Shumaker and Bondurant. He stated that he did not believe them and that he took Mittelstadter and Walls home. Rollston further said that Mittelstadter gave him the gun to get rid of and at that point, he said to himself ". . . maybe they did and maybe they didn't, I don't know." He next said he hid the gun in a ditch because it may have been a joke and he still did not believe them. He next described disposing of the gun the next day with Lisa Morey. He did not mention returning to the house to verify the murders as previously stated to her. He also said that they never said why they killed Bondurant and Shumaker. He stated that at one point he smelled the gun and that it smelled like it had been fired, but he was not sure.

Rollston further said in his statement to the police that Mittelstadter told him Walls pulled the trigger; that Walls gave the gun to Mittelstadter to get rid of; that Mittelstadter gave him the gun and knife to dispose of; and that he did not know why they did it. Rollston then stated he had overheard Walls talking to Mittelstadter earlier in the evening about "offing" Shumaker when Shumaker was in the car with them, and he asked if they were just kidding, and received no response.

Detective East then questioned Rollston on why he left when a car pulled in the driveway and stayed in the area. Rollston said he wanted to leave; that he went around in a circle; that he met them on the road; and that it was not an arranged meeting. At another point, Rollston said he left because he thought it was a police car.

■ Rollston argues that the evidence of his guilt was nullified as a matter of law because he told Lisa Morey and the police that it was difficult for him to believe that the victims were dead. This argument fails for two reasons. First, a jury is not required to accept *in toto* an accused's statement, but may rely on it in whole, in part, or reject it completely. *Durham v. Commonwealth*, 214 Va. 166, 169, 198 S.E.2d 603, 606 (1973); *Upshur v. Commonwealth*, 170 Va. 649, 655, 197 S.E. 435, 437 (1938). Second, on appeal, Rollston's claim of disbelief must be viewed in the light most favorable to the Commonwealth. When so viewed, these claims must be interpreted either as mere fabrications to conceal guilt, or as mere expressions of surprise that he and his cohorts actually accomplished what they set out to do. For example,

Rollston told the police that after the murders, "I asked Keith [Mittelstadter], I said, 'did you all off Johnny,' and he said 'yeah,' and I said, 'man, I can't believe it, you know, I just can't believe it,' and Keith said, 'I can't believe it neither.'" Even if the jurors concluded that this conversation actually occurred, they obviously could have reasonably interpreted it as the reflections of two confederates expressing surprise that they had been bold enough to carry out their common plan.

In *Grant v. Commonwealth*, 216 Va. 166, 217 S.E.2d 806 (1975) the Supreme Court said:

> While there is no direct evidence that the defendant was present at the scene of the robbery and actively participating in the crime, the circumstantial evidence points unerringly to his guilt as an aider and abettor of the offense. We believe the evidence permits the reasonable inference that, while the robbery was in progress, the defendant, at some convenient distance from the scene, was serving as a lookout, waiting to aid the robbers in their escape. The evidence permits the further inference that, following the robbery, the defendant acted as the driver of the "getaway" car in the abortive escape attempt. Accordingly, he was properly convicted as a principal in the second degree.

*Id.* at 168-69, 217 S.E.2d at 808. The evidence in the present case is even stronger than the evidence in *Grant* because in *Grant* there was no evidence as to exactly where Grant was waiting for his friends and no direct evidence that he had heard his friends discussing the robbery.

 Rollston's multiple inconsistent stories to Lisa Morey and the police are further evidence of his guilt. A defendant's false statements are probative to show he is trying to conceal his guilt, and thus is evidence of his guilt. *Carter v. Commonwealth*, 223 Va. 528, 532, 290 S.E.2d 865, 867 (1982); *Toler v. Commonwealth*, 188 Va. 774, 782, 51 S.E.2d 210, 214 (1949); *see also Wilson v. United States*, 162 U.S. 613, 621 (1896); *United States v. Martindale*, 790 F.2d 1129, 1132 (4th Cir.), *cert. denied*, 479 U.S. 855 (1986). We find that the evidence is sufficient beyond a reasonable doubt for the jury to have concluded that Rollston was the lookout and "getaway" driver for the murders and thus, guilty as a principal in the second degree.

Rollston further asserts that the evidence as to the firearms convictions was insufficient because "no evidence was presented . . . that [he] knew anyone . . . had a firearm prior to the commission of the murders." This contention is without merit. *See Carter v. Commonwealth*, 232 Va. 122, 126, 348 S.E.2d 265, 267 (1986).

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

Coleman, J., and Willis, J., concurred.