COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Athey and Chaney
Argued at Norfolk, Virginia


KATHERINE ADELLE KELLY

MEMORANDUM OPINION* BY
v.        Record No. 0675-21-1                 JUDGE VERNIDA R. CHANEY
                                               AUGUST 2, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG AND
COUNTY OF JAMES CITY
Michael E. McGinty, Judge

Richard G. Collins (Collins & Hyman, P.L.C., on brief), for
appellant.

Craig W. Stallard, Senior Assistant Attorney General, (Jason S.
Miyares, Attorney General, on brief), for appellee.


Katherine Adelle Kelly ("Kelly") appeals the judgment of the Circuit Court of the City of

Williamsburg and the County of James City (the "trial court") convicting her of malicious

wounding in violation of Code § 18.2-51 and aggravated malicious wounding in violation of

Code § 18.2-51.2.[1]  The trial court sentenced Kelly to incarceration for five years with four years

and nine months suspended for malicious wounding and ten years with nine years suspended for

aggravated malicious wounding.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Kelly was also charged with robbery, burglary with the intent to commit murder or
robbery, and conspiracy to commit aggravated malicious wounding.  The trial court granted the
Commonwealth's motion for nolle prosequi of the robbery charge.  The trial court granted
Kelly's motion to strike the burglary charge and granted Kelly's renewed motion to strike the
conspiracy charge.

Kelly was tried in a joint bench trial with her father as her co-defendant. According to the undisputed evidence, Kelly's father is the one who stabbed each of the victims. Kelly was convicted as her father's accomplice.

Kelly contends on appeal that the trial court erred in finding the evidence sufficient to prove that her conduct created accomplice liability for aggravated malicious wounding and malicious wounding. Kelly also argues that the evidence is insufficient to prove that a victim's injuries constituted permanent and significant impairment, a necessary element of *aggravated* malicious wounding. This Court finds that the evidence is sufficient to sustain Kelly's convictions; therefore, we affirm the trial court's judgment.

I. BACKGROUND[2]

A. The Events of August 28-29, 2020

On the evening of August 28, 2020, Roy Boykins ("Boykins") invited Kelly to the apartment that he shared with his cousin, Cortez Jones ("Cortez"),[3] and Treyvon Foster ("Foster"). Boykins, Cortez, and Kelly went to school together. That night, Boykins and Kelly had consensual sex in Boykins' bedroom while Cortez and Foster were elsewhere in the apartment. Thereafter, the group smoked marijuana together.

Cortez eventually told Kelly to leave because he did not want her there when a group of other expected visitors arrived. Cortez told Kelly he wanted her to leave because her brother was known as a snitch. Although Kelly did not want to go, she eventually left.

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).

[3] Cortez Jones was referred to as "Cortez" throughout the trial.

- 2 -

After Kelly left Boykins' apartment, she called her father and met with him at the motel where he worked and resided. Kelly told her father that some men had attempted to rape her that night and that one of them called her brother a snitch. After this conversation, Kelly drove her father and another man to Boykins' apartment.

Around 1:30 a.m. that night, Kelly returned to Boykins' apartment with her father and the unidentified man. Kelly knocked on the apartment door. Cortez was alone playing a video game when he heard someone knock on the door. As Cortez pulled the door open, Kelly's father pushed on the door and entered the apartment. Cortez heard Kelly's father ask, "Who said it?" Kelly pointed at Cortez. Then Kelly's father repeatedly stabbed Cortez. Cortez observed that "everybody's facial expressions showed that it was kind of unexpected."

Cortez backed up into the kitchen as Kelly's father attacked him. They fought in the kitchen, and then Cortez ran to the living room. Kelly's father pushed Cortez onto a chair, and they both fell to the floor.

The sound of banging awakened Boykins, who was asleep in his room. When he got up to investigate, Boykins saw Kelly's father stabbing Cortez. Boykins observed Kelly pulling her father and telling him to get off Cortez. Boykins ran out and pushed Kelly's father off Cortez. Then Kelly's father went after Boykins and stabbed him in the shoulder. After he stabbed Boykins, Kelly's father said, "Shoot them," and then left the apartment, followed by Kelly and the unidentified man. Then Kelly drove her father and the unidentified man back to the motel.

As a result of the stabbing, Cortez had sixteen stab wounds and numerous scars. Cortez was stabbed once in the neck and three times in the face, including a stab wound to his eye. At the time of trial, Cortez had a scar on his face that was a half-inch to three-quarters of an inch long, and a one-inch scar on his neck. Cortez was also stabbed in the back of his head and on both legs. He had a quarter-size scar on his shoulder and multiple two-inch scars on his legs.

B. Kelly's Co-defendant Father

Kelly's father and co-defendant, Timothy Patrick Kelly ("Kelly's father"), entered pleas of not guilty by reason of insanity.[4] Kelly's father had a history of serious mental illness and violent conduct. He was diagnosed with schizoaffective disorder. At age fifteen, he stabbed another student in an unprovoked attack, and he stabbed someone else when he was in prison. The trial court took judicial notice that the same circuit court found Kelly's father not guilty by reason of insanity ("NGRI") in another case in April 2017. In March 2020, Kelly's father was released from NGRI treatment at Eastern State Hospital.

Kelly's father testified that a couple of days before August 28, 2020, his paranoia led him to attack a man near his motel room. Kelly pulled her father off the man and told him that her father was "not in [his] right frame of mind."

Kelly's father testified that on the night of August 28, 2020, Kelly sounded upset on the phone and was visibly upset when she met him at his motel. Kelly's father stated that Kelly was upset about her missing wallet and credit cards and she asked her father to go with her to recover her wallet from Boykins' apartment. Kelly's father claimed that Kelly did not tell him anything about a sexual assault.

The trial court asked Kelly's father whether Kelly had told him that the men tried to rape her. Kelly's father replied that Kelly never told him this, but the next day his son said that Kelly told him that the men wanted to have group sex with her. Then Kelly's father volunteered to the trial court that "the snitch thing" also had nothing to do with what he did to Cortez and Boykins.

---

[4] The trial court found Kelly's father guilty of aggravated malicious wounding, malicious wounding, and breaking and entering.

Kelly's father testified that before they drove to Boykins' apartment, Kelly agreed to give a stranger a ride to 7-Eleven. When the man asked Kelly for a ride, she replied, "No problem, but I have to go get my wallet first."

Kelly's father denied telling Kelly in advance that he intended to assault or stab people at Boykins' place. He testified that Kelly yelled at him as she pulled him off Cortez. When they left Boykins' apartment, Kelly pulled her father back to the car and drove him back to his motel. Then Kelly screamed at him in the motel parking lot, "What did you do? What did you do?"

About two days after the stabbings, Kelly's father fled to California, where he was subsequently arrested. While incarcerated at the Los Angeles County Jail, Mr. Kelly exhibited paranoid delusions that required the jail to transfer him to a psychiatric unit for psychiatric medication.

On cross-examination, when asked whether he was "willing to take the fall for the entire thing if [Kelly] gets to walk," Kelly's father answered, "Because I did everything. Yes, ma'am. . . . I know she didn't do anything. She's the victim."

Kelly's father claimed he would rather be incarcerated than be in a psychiatric hospital. When asked whether he had been trying to manipulate the system to benefit himself, Kelly's father answered, "Yeah, if anything except to go to the hospital." "So you lied to the police so that you could get the outcome you wanted?" asked the Commonwealth. Kelly's father answered, "I lied to the police so they wouldn't take me to a psych hospital. And I didn't even know if I was even a hundred percent lying at that time."

### C. Kelly's Text Messages

Around 10:00 a.m. on August 29, 2020, Kelly exchanged text messages with Cortez's girlfriend. Kelly's text messages acknowledged that she saw Cortez the night before at his

apartment and that she left because "he wasn't comfortable having me around."  Kelly denied

returning there after Cortez asked her to leave.  Kelly stated,

> I was over there for only like an hour to see Roy [Boykins] and
> Cortez told me to leave because he doesn't like my brother so they
> left my stuff outside the door I grabbed my shit then left and didn't
> come back idk why they think it's me that did something.

### D.  Kelly's Statements to Police

Investigator Logan English of the James City County Police Department and another

officer interrogated Kelly during their investigation of the stabbings of Cortez and Boykins.

Kelly said she went to Boykins' apartment after he invited her for drinks.  When she arrived,

Boykins was there with Cortez and another man.  Kelly claimed that after she had two drinks, the

men tried to move her toward a bedroom.  When Kelly refused, Boykins yelled at her to get out

and told her that he threw her stuff outside.

Kelly claimed that Cortez followed her to her car and told her to leave and not to say

anything.  Kelly stated that she drove away after Cortez said, "You have your things."  Kelly

claimed that she later realized that she had her purse and phone, but not her wallet.  She claimed

that the only reason they went back to Boykins' apartment was to get her wallet.

Kelly initially denied having sex with any of the men that night.  She repeatedly denied

having sex with Boykins, but she eventually admitted that they had consensual sex that night.

Kelly explained that she initially denied having sex because it made her look bad and she thought

her allegation of attempted rape would not be believed.

Kelly told her father that the men at Boykins' apartment tried to rape her.  Kelly

acknowledged that her father is "a loose cannon," but she denied knowing that her father was

going to stab anyone when she took him to Boykins' apartment.  Kelly claimed she did not want

to return to Boykins' apartment, but "they told me to go back there, so I did."  Kelly claimed that

- 6 -

if she had known that her father was off his psychiatric medications, she "would have never told him anything about what happened."

Kelly admitted that she drove her father and another man to Boykins' apartment. Kelly knocked on the door at her father's direction. When Cortez opened the door, her father pushed himself through the door. Kelly's father asked her, "Who talked? Who said your brother was a snitch?" Kelly replied, "That one," and pointed at Cortez. Kelly again told the investigators that she didn't know that her father intended to stab Cortez.

Kelly admitted that after the stabbings, she drove her father and the other man back to the motel room. Kelly stated that at that time, her father "was just mad because of what they said and what they tried to do. And like my brother—they said things about my brother too and I think he was just really mad." Kelly acknowledged that they had called her brother a snitch.

Kelly claimed not to know the name of the other man who she drove to Boykins' apartment. She believed that he was staying at the same motel where her father stayed. Kelly claimed that the unidentified man was not involved in the stabbings, but that he took some things from Boykins' apartment. Kelly claimed that neither she nor her father stole anything from the apartment.

Investigator English challenged Kelly's claim that she didn't know what her father was going to do at Boykins' apartment. Investigator English remarked, "I'm assuming that you thought all he was going to do was tune them up a little bit." Then the second investigator interjected and, alluding to Kelly's earlier description of her father, stated, "You know he's a loose cannon." Kelly replied, "Yeah." Investigator English told Kelly, "You knew what was going to happen. You just didn't know to what extent it was going to happen. Does that make sense?" Kelly replied, "It makes sense, yeah."

E.  The Trial Court's Findings and Rulings

The trial court denied Kelly's motions to strike and made the following findings on the record:

- Kelly left Boykins' apartment feeling wronged in some way.

- Kelly went straight to her father and conversed with him.

- Kelly's conversation with her father was about something that had taken place.

- After Kelly told her father something had taken place, she drove her father and another man back there.

- Kelly said her father told her to go back there, so she did.

- Kelly nodded in affirmance and said, "yeah," when the Investigator told her "You knew your father was going back there to tune him up."

- Kelly's claim that she went back to Boykins' apartment for her wallet is not credible. Kelly said that she would not have told her father about what had happened if she had known that he was off his medications. This implies that she told him something that would upset him and a lack of a wallet would not do that.

- During the police interview, Kelly twice denied having sex with Boykins but then said that she denied it because she didn't want to make herself look bad.

- Kelly had to show them where the actual door was.

- In the interview with Investigator English, Kelly said, "'We pushed our way through the door,' which is consistent with the testimony of Cortez Jones."[5]

- Kelly's brother was called a snitch.

- Kelly's father asked her, "Who said it?"  Both sides conceded Kelly pointed out who that was.  "There's direction that's being given and that clearly implies to the Court that this wasn't about going back and getting her wallet. . . . [T]his wasn't about her wallet.  This was some sort of revenge or get after."

- There was concert of action between Kelly and her father in the attack on Cortez.

_____

[5] In her recorded police interview, Kelly said that she knocked on the apartment door at her father's direction and "he pushed himself through the door."  Additionally, Cortez testified that Kelly's father pushed the door in as Cortez opened it.  However, the Commonwealth argued to the trial court that Kelly said, "We pushed ourselves through the door," and "[i]n her words, 'We push ourselves in.'"

## II. ANALYSIS

### A. Standard of Review

On appellate review of a criminal conviction, this Court "consider[s] the evidence and all reasonable inferences flowing from that evidence in the light most favorable to the Commonwealth, the prevailing party at trial." *Pooler v. Commonwealth*, 71 Va. App. 214, 218 (2019) (quoting *Williams v. Commonwealth*, 49 Va. App. 439, 442 (2007) (*en banc*)). We "discard the evidence of the accused *in conflict* with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (emphasis added) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

This Court must show deference to the trial court's credibility determinations, which may only be disturbed if the evidence is "inherently incredible, or so contrary to human experience as to render it unworthy of belief." *Lopez v. Commonwealth*, 73 Va. App. 70, 81-82 (2021) (citing *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)). This deference extends to the trial court's determinations about the credibility of one's stated intention. *See id.* at 81.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v.*

*Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"[W]here a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused]." *Wright v. Commonwealth*, 292 Va. 386, 397 (2016) (alterations in original) (quoting *Commonwealth v. Smith*, 259 Va. 780, 782 (2000)). "[W]here, as here, a conviction is based on circumstantial evidence, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.'" *Garland v. Commonwealth*, 225 Va. 182, 184 (1983) (quoting *Carter v. Commonwealth*, 223 Va. 528, 532 (1982)). "While a conviction may properly be based upon circumstantial evidence, suspicion or even probability of guilt is not sufficient." *Gordon v. Commonwealth*, 212 Va. 298, 300 (1971).

### B. Proof of Kelly's Accomplice Liability

The evidence is sufficient to sustain Kelly's convictions for aggravated malicious wounding of Cortez and malicious wounding of Boykins because the evidence supports the trial court's finding that Kelly acted in concert with her father in the assault on Cortez. Kelly argues that the evidence failed to show that she shared her father's felonious purpose and specific intent to stab and wound Cortez and Boykins. However, such "lack of intent is . . . a defense to a conviction as a principal in the second degree," unless "there was concert of action and the resulting crime, whether such crime was originally contemplated or not, is a natural and probable consequence of the intended wrongful act." *McMorris v. Commonwealth*, 276 Va. 500, 505-06 (2008). The evidence supports the trial court's findings that there was concert of action between Kelly and her father in the assault on Cortez and that the resulting wounding of Cortez and

Boykins—even if not originally contemplated by Kelly—were incidental and probable consequences of Kelly's intended wrongful act.

The trial court found the facts in *Brown v. Commonwealth*, 130 Va. 733 (1921), analogous to the facts in the instant case. Brown was convicted of maliciously shooting Leroy White, although Brown's brother was the one who shot White. *Id.* at 736. The shooting happened when Brown set out to get back at White for throwing him out of White's house and into the street.[6] *Id.* at 735. On Brown's way to White's house with the plan to fight White, Brown encountered his brother and his nephew, both of whom decided to join him in his mission to fight White. *Id.* When they got to White's house, Brown knocked on the door. *Id.* When White opened the door, Brown pulled him out into the street. *Id.* at 736. Brown's brother pulled out a gun and shot at White. *Id.* The bullet missed White, but hit an innocent bystander. *Id.* As White was running away, Brown's brother shot White in the back. *Id.* After the shooting, Brown helped his brother to make his escape. *Id.* at 737.

Brown did not know that his brother was armed with a gun, and Brown did not plan or intend to shoot White. *Id.* at 735-36. But Brown's conviction for the malicious shooting of White was affirmed on appeal because

> [w]hat actually occurred was not an improbable consequence of the fight which they clearly intended to provoke. When two or more persons go to the home of a third party to whip him, they know he will in all reasonable probability use force in resisting the attack, and that bloodshed is likely to result on one or both sides.

*Id.* at 737-38. The Supreme Court in *Brown* approved the following quotation from *Wharton's Criminal Law*:

> All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are

---

[6] White's house was "a house of bad repute." *Brown*, 130 Va. at 735.

> responsible for such incidental crime. * * * Hence, it is not necessary that the crime should be a part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose.

*Id.* at 738 (quoting 1 *Wharton's Criminal Law* (11th ed.) § 258, pp. 329, 330).

Here, assuming that Kelly (i) did not know that her father was armed with a knife and (ii) did not share her father's intent to stab Cortez and Boykins, Kelly was criminally liable for these stabbings for the same reason that the defendant in *Brown* was criminally liable for his brother's shootings of the victims. The trial court rejected Kelly's hypothesis of innocence that her purpose in returning to Cortez's apartment was to recover her wallet. Deferring to the trial court's credibility determination in rejecting Kelly's explanation for her conduct, this Court holds that the evidence supports the trial court's finding that Kelly brought her father to Cortez's apartment for the criminal purpose of assaulting Cortez. Kelly acknowledges on appeal that she admitted to police investigators that she knew what her father was going to do, but not the extent of what he was going to do. *See* Amended Opening Br. at 9. With knowledge of her father's intent to assault Cortez, Kelly drove her father to Cortez's apartment building, informed her father which apartment was his, knocked on the door, pointed out Cortez as the one who called her brother a snitch, and drove her father away from the crime scene and back to his motel room. Kelly thereby demonstrated that she shared her father's intent to assault Cortez. *See Rollston v. Commonwealth*, 11 Va. App. 535, 539 (1991) ("When the alleged accomplice is actually present and performs overt acts of assistance or encouragement, he has communicated to the perpetrator his willingness to have the crime proceed and has demonstrated that he shares the criminal intent of the perpetrator." (quoting Groot, *Criminal Offenses and Defenses in Virginia* 183 (1984))). Because the assault on Cortez resulted from Kelly's concert of action with her father, Kelly was liable for the stabbings that resulted when her father used a knife in the commission of the

- 12 -

assault. Boykins' defense of Cortez and the subsequent stabbing of Boykins were incidental probable consequences of the assault on Cortez. Therefore, Kelly is also liable for the malicious wounding of Boykins. *See Brown*, 130 Va. at 737-38.

### C. Proof of Permanent and Significant Physical Impairment

The evidence is sufficient to support the trial court's finding that the malicious wounding of Cortez was aggravated under Code § 18.2-51.2 because he was severely injured and was caused to suffer permanent and significant physical impairment. This Court has recognized that disfiguring scars caused by bodily injury can constitute severe injury involving "permanent and significant impairment." *See Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995). Here, the evidence established that Cortez had sixteen stab wounds and multiple scars, including scars on his face, neck, shoulder, and legs. These scars were still visible at trial, over eight months after the attack. The trial court reasonably found from this evidence that Cortez's injuries constituted "permanent and significant physical impairment."

### III. CONCLUSION

The evidence is sufficient to prove Kelly's accomplice liability and to sustain Kelly's convictions for aggravated malicious wounding and malicious wounding. Therefore, this Court affirms the trial court's judgment.

*Affirmed*.