COURT OF APPEALS OF VIRGINIA


Present: Judges Bray, Bumgardner and Senior Judge Hodges
Argued at Chesapeake, Virginia


REBECCA L. SCOTT

MEMORANDUM OPINION* BY
v.    Record No. 2132-00-1        JUDGE WILLIAM H. HODGES
                                    APRIL 3, 2001
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Edward L. Hubbard, Judge

Charles E. Haden for appellant.

Virginia B. Theisen, Assistant Attorney
General (Mark L. Earley, Attorney General, on
brief), for appellee.


Rebecca L. Scott appeals her convictions for first degree murder, use of a firearm in the commission of a felony, criminal solicitation, and conspiracy. She contends (1) the trial court erred in admitting into evidence the preliminary hearing transcript of the testimony of James Armstrong; and (2) the evidence was insufficient to sustain her convictions. We affirm the convictions.

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

<u>Commonwealth</u>, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted).

So viewed, the evidence proved that at approximately 6:00 p.m. on October 31, 1999, Clarence Scott, Jr., appellant's grandfather, and her grandmother arrived home after returning from an out-of-town trip. Appellant's grandparents shared their home with their son, James Scott, and appellant, their sixteen-year-old granddaughter. When Clarence Scott entered the house, he saw a holster, a .22 magazine, and a butcher knife on the dining room table. Appellant was not in the house at that time. Appellant's grandparents discovered the dead body of James Scott in the den. James Scott, who had been shot, was sitting slumped over in his recliner.

The next morning at approximately 5:00, appellant arrived home accompanied by her boyfriend, Ray Grantham. Appellant asked her grandfather if she could wash her clothes. Appellant's grandfather said to appellant, "You know, your daddy is dead, go out there and take a look in his room and see what a mess it is . . . ." Appellant's grandfather told appellant that the police had been there and had told him to call them if he saw appellant and Grantham. As appellant's grandfather picked up the telephone to call the police, appellant went to her room and Grantham "hot-footed it out the door like he had ants in his pants."

-

On November 1, 1999, at 6:45 a.m., Detective Misty Mercer advised appellant of her Miranda rights and began to question her with respect to her father's death. Mercer testified that appellant initially denied any involvement in her father's death. Mercer stated that appellant was reluctant to talk to her because appellant did not want to get anyone in trouble. Eventually, appellant made a statement to Mercer, which was transcribed and introduced into evidence.

In that statement, appellant admitted that she and a group of people had been talking "seriously" about killing her father for the past two months. Appellant admitted she and Grantham had offered a person named "Shawn" money to kill her father. She said that the "pot" had gotten up to $1,500. She stated that Shawn never committed the crime, so they thought of other alternatives. She claimed that she had connections to gang members. She stated that she called some of her gang friends, but none of them would agree to kill her father. Appellant told Mercer that on Saturday night, October 30, 1999, while she was out with Grantham, her father paged her and told her to come home. Grantham took appellant home and then left. Appellant stated that her father was angry and she thought that he was going to hit her with a yardstick, so she ran into her room. She claimed that she left the house. When she returned, her father was at the computer. Appellant told Mercer that the next day, she went out with her friends, including Grantham, before

-

she went to work.  She acknowledged that Grantham knew about her father's behavior on Saturday night.  Appellant claimed that her father had previously physically abused her.  Appellant told Mercer that "[w]e were all to our limits."  She thought that "today was the day" and that Grantham or someone else was going to kill her father.

Appellant told Mercer that when she arrived home from work at approximately 4:15 p.m. on October 31, 1999, her grandparents were out of town and her father was asleep.  Appellant admitted that she retrieved two of her father's guns and took extra bullets "cause usually [her] Dad wants them stay loaded." Appellant stated that she placed the guns on the dining room table.  Appellant admitted that she knew Grantham was coming over to her house, but denied that she knew James Armstrong would be with him.  When Mercer asked appellant, "And you knew what [Grantham] was gonna do when he got there," appellant replied, "Basically, yes."

Appellant told Mercer that when Grantham and Armstrong arrived at her house, they entered the dining room and saw the guns.  She stated that Grantham was wearing gloves and a blue ski mask.  Appellant admitted that she gave the automatic gun to Grantham, but when he tried to use it, it did not work.  During this time, Armstrong and Grantham were arguing over who would kill appellant's father.  Appellant told Mercer that Armstrong knew that the first person to kill her father would get $1,500.

-

Appellant stated that after the first gun did not work, Grantham came back to the dining room and appellant handed him the other gun and then went back to her room.  She admitted that she heard one gunshot.  After that, she got her bookbag and they all left the house.  She told Mercer that Grantham disposed of the gun, gloves, and mask at the location where they dropped off Armstrong.  After that, appellant and Grantham went to the home of her friend, Heather.

Mary Ellen Goodman, a convicted felon who shared a room with appellant for several days in the medical ward of the Hampton Roads Regional Jail, testified that appellant told her about the murder.  Goodman stated that appellant told her that the murder happened on Halloween night and that they had been planning it for months.  Appellant told her they did it on Halloween because her grandparents were gone.  Appellant told Goodman that Grantham and a boy named "James" were involved.  Appellant told Goodman that she challenged them to kill her father, saying, "You don't have the balls to kill my dad . . . ."  Appellant told Goodman that she went upstairs and got a pillowcase for one of them to put over his face and that the other one placed a ski mask over his face.  Appellant told Goodman that a gun was already on the dining room table and that "[Grantham and James] took the gun, walked down three steps to the bedroom, and [appellant] also got a pillow from her bedroom, and they held the pillow over the father's head and pulled the

-

trigger, but the gun didn't go off."  Grantham and James returned to the dining room, gave the gun to appellant, and told her that it wouldn't go off.  She called them a "dumb ass" and told them they didn't take the safety off or something.  Then appellant "snuck" into her father's room and got another gun out of the closet and brought the gun out to them.  She loaded it with a full clip and gave it to Grantham, but he didn't want to shoot appellant's father.  He was crying and shaking.  James told him, "Come on, you got to do it or the dad is going to beat her again, and she'll lose the baby this time," and appellant kept saying, "You don't have the balls, you don't have the balls."  Then Grantham and James walked into the father's room and Grantham shot appellant's father while she was upstairs in her bedroom getting a bag of clothes ready so she could run away with them.  Appellant ran downstairs and they all left the house.  They went to the home of a person named "Steve" and gave him the gun and the pillowcase.  Steve threw "the evidence" into a river or creek behind the house.  Goodman stated that she was willing to testify because she feared for appellant's unborn child, who appellant referred to as "the little bastard thing." Goodman stated that all her charges have been dropped and that the Commonwealth had not offered her anything for her testimony.

Patrick Campbell testified that he had known appellant for approximately one and one-half years.  Campbell stated that on the evening of October 31, 1999, appellant, Grantham, and

-

Armstrong came to his house at approximately 6:30 to 7:30 p.m. Grantham had a pillowcase, which Campbell found the next day stuffed inside a cabinet. There is a pond behind Campbell's house. He did not see anyone discard anything into the pond, but he heard a loud splash while they were there. Campbell heard a "slight remark" from appellant that her dad was dead.

Mary Fuller testified that appellant and Grantham visited her on the evening of October 31, 1999. Appellant ate dinner and then went trick-or-treating with Fuller's son. Appellant did not act as if anything was wrong. Appellant told Fuller that her father was in West Virginia, that he was fine, and that he said she and Grantham could go to Fuller's house. Appellant told Fuller that she hated her father. Fuller stated that Grantham acted as if something was wrong and would not eat.

The Commonwealth subpoenaed Armstrong to testify at trial at two different addresses, 375 Hilltop Drive, Apartment C, the address Armstrong gave at appellant's preliminary hearing, and 304 Fourstall, Apartment 3, Newport News, Virginia, another address provided by Armstrong. The Commonwealth also obtained personal service on Armstrong to testify at appellant's trial when Armstrong was in the courthouse on another matter. Armstrong did not appear in court on the date of appellant's trial, and the Commonwealth represented that it had not heard from him and did not know why he was not there to testify. The Commonwealth requested that Armstrong be declared an unavailable

-

witness and that it be allowed to introduce into evidence the January 19, 2000 transcript of his testimony given at appellant's preliminary hearing.

Appellant's counsel objected and argued that Armstrong, who had been subpoenaed, was not an unavailable witness and that the Commonwealth should go forward without his testimony or not go forward at all. Appellant also argued that the use of the transcript denied her right of confrontation. The trial court overruled appellant's objection and allowed the Commonwealth to introduce Armstrong's preliminary hearing transcript into evidence.

Armstrong testified at the preliminary hearing that Grantham came to Armstrong's job on October 31, 1999, and told him that "today's the day we're going to kill Rebecca's dad." Grantham told Armstrong that he was going to do it, but he would pay Armstrong if Armstrong was "thinking about doing that." Armstrong testified that when they arrived at appellant's house that day, he saw appellant give a gun to Grantham, who was wearing a ski mask and gloves. Armstrong testified that the first gun did not work and that appellant said she was going to the cabinet to get another gun. Armstrong saw Grantham with another gun and he saw Grantham shoot appellant's father.

Grantham testified on behalf of appellant. Grantham claimed that Armstrong took the gun and shot appellant's father. Grantham denied killing appellant's father and stated that

-

appellant had nothing to do with the murder.  Grantham testified that appellant's father was abusing her.  He stated that the murder was not planned.  He claimed that when he and Armstrong arrived at appellant's house on October 31, 1999, she did not know Armstrong was coming over and that she thought Grantham was coming to get her away from her father.  Grantham claimed that appellant was cleaning two of her father's guns when he and Armstrong arrived at appellant's house because appellant's father told her the guns needed to be cleaned by the end of the weekend.

Appellant testified that she did not know Grantham was going to kill her father on October 31, 1999.  She denied any involvement in the murder and contradicted some of the statements she made to Mercer on November 1, 1999.  She contended that her father had been sexually abusing her since the age of seven and that he had been physically abusing her since the age of thirteen or fourteen.  Nevertheless, she denied that she wanted her father dead.  Appellant testified that she had reported the physical abuse to authorities prior to the murder, but had not reported the sexual abuse to anyone before her father's murder.

On rebuttal, Mercer testified that she obtained a taped statement from Grantham on November 1, 1999.  Mercer stated that Grantham told her that he and appellant had talked to several people about hiring them to kill appellant's father during the

-

month or so before the murder.  Grantham told Mercer that he and Armstrong went to appellant's house on October 31, 1999. Grantham stated that when they arrived at the house, there were two guns on the dining room table and that he had a mask and gloves.  Grantham told Mercer that he took one of the guns and tried to shoot appellant's father, but the gun did not work. Grantham retrieved the other gun, took a pillow, placed it up to appellant's father's head, pulled the trigger, and killed him.

### I.  Admission of Preliminary Hearing Transcript of Armstrong's Testimony

In Longshore v. Commonwealth, 260 Va. 3, 530 S.E.2d 146 (2000), the Supreme Court held that a trial court may admit into evidence the preliminary hearing testimony of a witness who is absent at a subsequent criminal trial if the following conditions are satisfied:

> (1) that the witness is presently unavailable; (2) that the prior testimony of the witness was given under oath (or in a form of affirmation that is legally sufficient); (3) that the prior testimony was accurately recorded or that the person who seeks to relate the testimony of the unavailable witness can state the subject matter of the unavailable witness's testimony with clarity and in detail; and (4) that the party against whom the prior testimony is offered was present, and represented by counsel, at the preliminary hearing and was afforded the opportunity of cross-examination when the witness testified at the preliminary hearing.

Id. at 3-4, 530 S.E.2d at 146.

-

Appellant contends that the Commonwealth failed to establish that Armstrong was unavailable and that his testimony was reliable.  Appellant also argues that the admission of the transcript of Armstrong's preliminary hearing testimony denied her Sixth Amendment right to confront her accusers.

## Unavailability

> The party offering the testimony bears the burden of establishing the witness' unavailability.
> "'[A] declarant is unavailable if the party seeking to introduce the statement has been unable by diligent inquiry to locate the declarant.'"  We have held that reasonable or "due diligence is that amount of prudence 'as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances.'"  This standard "requires only a good faith, reasonable effort; it does not require that every possibility, no matter how remote, be exhausted."  Furthermore, "it is well established that the sufficiency of the proof to establish the unavailability of a witness is largely within the discretion of the trial [judge], and, in the absence of a showing that such discretion has been abused, will not be interfered with on appeal."

Bennett v. Commonwealth, 33 Va. App. 335, 347-48, 533 S.E.2d 22, 28-29 (2000) (en banc) (citations omitted).

The trial court did not abuse its discretion in finding that Armstrong was unavailable because the Commonwealth had exercised due diligence to secure Armstrong's appearance at trial.  The Commonwealth subpoenaed Armstrong at two different addresses and obtained personal service upon him while he was in

-

the courthouse on another matter.  No evidence suggested that Armstrong had relocated or was otherwise unaware of his obligation to appear at appellant's trial.  Under these circumstances, the trial court did not abuse its discretion in concluding that the Commonwealth had acted reasonably and diligently to secure Armstrong's attendance at trial and thereby establishing his unavailability.

## Reliability

Appellant argues on appeal that the preliminary hearing transcript of Armstrong's testimony should not have been admitted into evidence at her trial because his testimony was not credible.  Appellant did not make this argument to the trial court at the time that she objected to the admission of the transcript when the Commonwealth offered it into evidence.[1]  "To be timely, an objection must be made when the occasion arises -- at the time the evidence is offered or the statement made."  Marlowe v. Commonwealth, 2 Va. App. 619, 621, 347 S.E.2d 167, 168 (1986).  Because appellant did not raise this particular argument at the time the transcript was offered into evidence and when she objected to its admission, we will not consider it on appeal.  See Rule 5A:18.

---

[1] Appellant's counsel argued during closing argument that Armstrong's preliminary hearing testimony was not credible.

## Right of Confrontation

Appellant argues that her trial counsel, who was different from her counsel at the time of her preliminary hearing, did not have an opportunity to cross-examine Armstrong at the preliminary hearing and, therefore, she was denied her Sixth Amendment right of confrontation.

> An accused's right to confrontation is satisfied with respect to the admission of prior testimony when the prior testimony was given under oath in an adversary proceeding, such as a preliminary hearing, at which the accused had an adequate opportunity to cross-examine the witness on the issues which later develop at trial.

Jones v. Commonwealth, 22 Va. App. 46, 52, 467 S.E.2d 841, 844 (1996).

Armstrong's testimony at the preliminary hearing was given under oath, and appellant was represented by counsel at the preliminary hearing. The fact that appellant's trial counsel was different from her preliminary hearing counsel was of no consequence. Appellant's counsel was provided an adequate opportunity at the preliminary hearing to cross-examine Armstrong on the issues that later developed at trial. Under these circumstances, appellant's Sixth Amendment right of confrontation was met, and the trial court did not abuse its discretion in admitting the preliminary hearing transcript of Armstrong's testimony into evidence.

-

II. <u>Sufficiency of the Evidence</u>

Code § 18.2-29 provides that "[a]ny person who commands, entreats, or otherwise attempts to persuade another person to commit a felony, shall be guilty of [criminal solicitation,] a Class 6 felony." Thus, "[c]riminal solicitation involves the attempt of the accused to incite another to commit a criminal offense. 'It is immaterial whether the solicitation has any effect and whether the crime solicited is in fact committed. . . . The gist of [the] offense is incitement.'" <u>Branche v. Commonwealth</u>, 25 Va. App. 480, 490, 489 S.E.2d 692, 697 (1997). "[T]he act of solicitation may be completed before an attempt is made to commit the solicited crime." <u>Ford v. Commonwealth</u>, 10 Va. App. 224, 226, 391 S.E.2d 603, 604 (1990).

"A conspiracy is 'an agreement between two or more persons by some concerted action to commit an offense.'" <u>Smith v. Commonwealth</u>, 19 Va. App. 594, 598, 453 S.E.2d 572, 575 (1995) (citations omitted).

> "A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance." . . . The defendant's conduct must consist of "inciting, encouraging, advising or assisting in the [crime]." It must be shown that the defendant procured, encouraged, countenanced, or approved commission of the crime. "To constitute one an aider and abettor, he must be guilty of some overt act, or he must share the criminal intent of the principal."

-

Rollston v. Commonwealth, 11 Va. App. 535, 539, 399 S.E.2d 823, 825 (1991) (citations omitted). See Code § 18.2-18 (in felony cases, except most capital murders, principal in second degree may be indicted, tried, convicted and punished in all respects as if principal in first degree).

Based upon Mercer's testimony and appellant's statements to Mercer, the fact finder could conclude that appellant attempted to persuade others to kill her father and that she conspired with Grantham to kill her father. Based upon Mercer's testimony and appellant's statements to Mercer, appellant's statements to Goodman, and Armstrong's testimony, the fact finder could conclude that appellant was present at the commission of the crime and that she incited, encouraged, advised, or assisted in the murder of her father. The fact finder was entitled to accept the testimony of the Commonwealth's witnesses and to reject the contrary testimony of appellant and Grantham. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). The testimony of the Commonwealth's witnesses was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that appellant was guilty of criminal solicitation and conspiracy and that she was guilty of

-

murder and the use of a firearm in the commission of a felony as a principal in the second degree.

For these reasons, we affirm appellant's convictions.

<u>Affirmed.</u>