COURT OF APPEALS OF VIRGINIA


Present: Judges Frank, Felton and Kelsey
Argued at Richmond, Virginia


JAMAR SHANTE PAXTON

MEMORANDUM OPINION* BY
v.    Record No. 3063-01-2     JUDGE WALTER S. FELTON, JR.
DECEMBER 31, 2002
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Margaret P. Spencer, Judge

Rodney L. Jefferson (Jefferson & Lassiter, on
brief), for appellant.

Margaret W. Reed, Assistant Attorney General
(Jerry W. Kilgore, Attorney General, on
brief), for appellee.


Jamar Paxton was convicted in a jury trial of (1) first

degree murder, in violation of Code § 18.2-32; (2) use of a

firearm during the commission of a murder, in violation of Code

§ 18.2-53.1; (3) maiming, in violation of Code § 18.2-51; (4)

attempted robbery, in violation of Code §§ 18.2-26 and 18.2-58;

(5) shooting into an occupied dwelling, in violation of Code

§ 18.2-279; (6) use of a firearm during the commission of a

malicious wounding, in violation of Code § 18.2-53.1; and (7)

use of a firearm during the commission of an attempted robbery,

in violation of Code § 18.2-53.1.

    * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

On appeal, he contends that it was reversible error for the trial court (1) to allow a witness to testify to a co-conspirator's statement when the Commonwealth had not established a prima facie case of conspiracy; (2) to admit statements into evidence as excited utterances or co-conspirator statements when there was no identification of the declarant; (3) to refuse a jury instruction on the offense of accessory after the fact; (4) to refuse to clarify the jury's question regarding Instruction 7 (concert of action) and Instruction 13 (principal in the second degree); and (5) to allow the jury verdict to stand when the evidence was insufficient to support conviction. We affirm the judgment of the trial court.

## I. BACKGROUND

### A. THE OFFENSES

On the evening of February 14, 2001, Lynwood Thrower confronted Matthias Washington on the front porch of 3101 Garland Avenue. Thrower demanded fifty dollars and drugs from Washington. Washington told Thrower that he did not have any drugs or money to spare. Thrower informed Washington that he was going to come back "with his boys" and rob him. He subsequently stated, "[Y]ou know what, you going to be my next victim." Thrower drove away in a four-door gray Cadillac.

Approximately one hour later, Thrower returned to 3101 Garland Avenue with Jamar Paxton, William Sally, also known as "Orbit," and an unnamed individual. Thrower was wearing a

-

bulletproof vest and armed with an AK-74 assault rifle.  He directed Paxton, Sally, and the unnamed individual to go around to the back of the house.

Upon seeing Thrower, Washington ran inside and up the staircase past Adrian Harris, who resided upstairs.  Thrower followed him inside and from the bottom of the stairs, yelled to someone.  Hearing Thrower, Washington realized that people were coming around to the back of the house so he exited through an upstairs window and escaped by jumping off the porch roof.

Thrower walked up the stairs and placed the muzzle of the assault rifle between Harris' eyes.  He then yelled, "Kick the backdoor in."  Almost immediately, a shot was fired at the back door and then the door was kicked in.  After a second shot from the back of the house rang out, Thrower proceeded back down the stairs.

At the time of the intrusion, Melvin Brinkley and his girlfriend Roberta Latham were residing in the downstairs of 3101 Garland Avenue.  That night they were babysitting twenty-three-month-old Kayla Brown.  Brinkley and Latham were sleeping in the back room when loud kicks and gunshots awakened them.  When Brinkley got up, three men were standing in the kitchen doorway.  He heard one say, "Get the money, get the drugs."  Shortly thereafter another said, "Oops, we're in the wrong house."  Brinkley stated that at least two different

-

weapons were fired before the three men turned and left through the back door.

Brinkley was unable to identify the men because the intruders cut the electricity to the house. When the three men left, Latham ran out the front door. Brinkley followed her, but remembered that the infant Kayla was sleeping on the couch. He ran back into the apartment to get Kayla. Upon entering the apartment, Brinkley closed and locked the door. Suddenly, gunfire erupted through the front door. Thrower began firing the AK-74 into the downstairs apartment, hitting Brinkley in the leg. Kayla died as a result of multiple gunshots to her head.

### B. THE EVIDENCE

Detective Rick Warthen, a forensics crime scene investigator with the Richmond Police Department, inspected the crime scene. He recovered cartridge cases and bullets indicating the use of at least three firearms. More than twenty of the cartridge cases found near the front door of the downstairs apartment were fired from an assault rifle. In addition to collecting bullets and cartridge cases, blood samples were also collected. Of the numerous samples collected, DNA testing revealed that Paxton's blood was found inside the back door of the downstairs apartment and on a rubber hose found in the alleyway of 3101 Garland Avenue.

In addition to the crime scene being inspected, Thrower's gray Cadillac was searched for evidence. The Cadillac was seen

-

after the shooting, parked in the emergency room driveway of the Medical College of Virginia. Detective William Thompson saw the Cadillac when he responded to a call at the hospital. Inside the hospital, he found Thrower and Sally in the waiting room while Paxton received treatment for a gunshot wound in his foot.

The Cadillac was eventually impounded and searched by Detective Warthen for evidence. In the rear passenger seat, a bloody Timberland boot was found. DNA testing revealed the blood to be Paxton's. A bottle of prescription drugs containing Paxton's name was also discovered in the vehicle. DNA testing on a "doo rag" and a skullcap found in the vehicle revealed that Sally could not be eliminated as a contributor to DNA samples taken from them.[1] However, Thrower and Paxton were eliminated. DNA testing of samples taken from the steering wheel revealed that Sally and Paxton were eliminated as possible contributors, but Thrower could not be eliminated as a contributor.

Detective James Simmons interviewed Paxton regarding the events of February 14, 2001. In that interview, Paxton denied being in Thrower's Cadillac that evening. He claimed he was leaving his cousin's house when he was shot in the foot and that Sally and Thrower came to the hospital in the Cadillac after his cousin had dropped him off at the emergency room. He denied being at 3101 Garland Avenue when Brinkley and Kayla were shot.

---

[1] A "doo rag" is a brimless, close-fitting piece of cloth worn on the head, such as a bandana.

-

He also denied shooting a gun that night.  Gunshot residue tests

were performed on Paxton, Sally, and Thrower.  Test results

showed that all three had primer residue on their hands.

      While awaiting trial, in the Richmond City jail, Paxton and

Thrower exchanged letters through a jail trustee.  A forensic

document examiner compared their letters to other known writings

of Paxton and Thrower.  He concluded that the letters were

indeed written by Paxton and Thrower.  The contents of Thrower's

letter were not introduced at trial.  However, Paxton's letter

was admitted and stated the following:

> I didn't want to tell them I was anywhere
> near the house but I'm trying to help you.
> They have eye witnesses saying that me and
> Orbit was on the back porch the whole time
> then they heard me say oh shit and me and
> Orbit ran to the car.  Eye witnesses saw the
> car parked in the alley.  The lawyers know
> just about everything.  If the witnesses
> seen us in the back porch that what we
> should say.  I can't say that I shot myself
> because they checked me for gun powder and I
> didn't have any on my hands.  So, that won't
> work.  Just tell them that me and Orbit was
> on the back porch and you went around the
> front.  Me and Orbit will tell them that we
> didn't even see you with a gun so that means
> if you had a gun it had to have been a small
> one because we didn't notice it.  And a big
> gun wouldn't fit around your waist without
> you walking funny and we didn't see you
> walking funny at all.  You get what I'm
> saying?  That means one of them had to have
> the big gun.  I'm going to tell them I don't
> know exactly where the gun shots came from
> but I'm assuming though [sic] a window at
> the house and it sounded like an AKA.  So
> that means that one of them had to shoot me
> because you had a hand gun.  I can also tell
> them that I heard two different guns

-

shooting.  I'm not going to snitch on your [sic] or nothing like that.  I will do whatever I can to help you as far as stretching the story but I can't tell them I did something that I didn't do and especially something that DNA will prove I didn't do because that will cross me up.  I got your back though.  You got to realize they got witnesses that watched the whole thing from after I got shot because they heard those first couple of gun shots.  People was probably watching everything through their windows.  If they ask who's Valentines stuff in the car tell them it's mines and that you was about to take me to my baby-mother's house.  And that the reason you didn't take me earlier is because you didn't see me until late that night at the house where everybody be chillin at.

I'll holla back.

## C.  TRIAL

At trial, Harris testified for the Commonwealth.  Among other things, he testified that he heard Thrower say, "Kick the backdoor in."  Paxton objected on the grounds that the statement was hearsay, inflammatory, and prejudicial.  The court ruled the statement was admissible under the co-conspirator exception to the hearsay rule.  The trial court ruled that the statement was admissible even though Paxton was not indicted for conspiracy to commit murder because the Commonwealth had established a prima facie existence of a conspiracy.  See Anderson v. Commonwealth, 215 Va. 21, 205 S.E.2d 393 (1974); Rabeiro v. Commonwealth, 10 Va. App. 61, 389 S.E.2d 731 (1990).

Brinkley also testified on behalf of the Commonwealth.  He testified that he heard one person at the back door say, "Get

-

the money, get the drugs," and another say, "Oops, we're in the wrong house."  Paxton objected on the grounds that the statements were hearsay and that Brinkley could not identify who made the statements.  Brinkley did, however, identify who made the statements.  He identified the statements as coming from the three individuals who were standing in the kitchen just inside the back door that had just been kicked in.  The prosecutor argued that the statements were not hearsay, as they were offered to prove they were said, not for the truth of the matter asserted.  The court ruled the statements were admissible as either co-conspirators' statements or excited utterances.

At the conclusion of trial, Paxton requested that an accessory after the fact instruction be given to the jury.  The court denied the request citing <u>Dalton v. Commonwealth</u>, 259 Va. 249, 524 S.E.2d 860 (2000), which held that unless the Commonwealth charged a defendant with being an accessory after the fact, he was not entitled to an accessory after the fact instruction.

During jury deliberations, the jury sent a note to the court asking if the judge could clarify instructions on "concert of action" and "principal in the second degree."  The following colloquy ensued between the court and trial counsel:

> THE COURT:  Does either counsel wish to see the juror's note or the instructions?
>
> MR. HICKS [Commonwealth's Attorney]:  No, ma'am.

-

MR.HERRING [Paxton's attorney]:  If the Court read the note, I don't need to see it. Judge, I would simply say that any comment or editorial from counsel at this point would do more harm than good.  We've argued those instructions at length.  It's up to the jurors now to sort them out as best they can and arrive at a verdict if they can.

THE COURT:  Do you have any problems with me telling the jury that Instruction No. 7 [concert of action] and Instruction No. 13 [principal in the second degree] state the law that is applicable to this case, please read them again carefully?

MR. HERRING:  I don't have any objection. That's 7 and 13?

THE COURT:  Yes.

MR. HICKS:  Counsel for the Commonwealth also would not have any objection to the court advising the jury that the law of the case to be read as a whole, et cetera.

THE COURT:  So the Court will tell them that Instruction 7 and Instruction 13 state the law applicable to the case.  Please read these instructions again and follow all the instructions the Court has given them.

The jury was so instructed and subsequently convicted Paxton of

(1) first degree murder, in violation of Code § 18.2-32; (2) use

of a firearm during the commission of a murder, in violation of

Code § 18.2-53.1; (3) maiming, in violation of Code § 18.2-51;

(4) attempted robbery, in violation of Code §§ 18.2-26 and

18.2-58; (5) shooting into an occupied dwelling, in violation of

Code § 18.2-279; (6) use of a firearm during the commission of a

malicious wounding, in violation of Code § 18.2-53.1; and (7)

use of a firearm during the commission of an attempted robbery, in violation of Code § 18.2-53.1.

## II.  CO-CONSPIRATOR STATEMENTS

Paxton first argues that the trial court erred in admitting hearsay testimony of an alleged co-conspirator into evidence because he was not charged with conspiracy to commit robbery and the persons making the statements, and to whom the statements were made, were not identified.  We hold that the trial court did not err in admitting the statements.

Washington testified that Thrower approached him and demanded money and drugs from him.  When he refused, Thrower threatened Washington that he would return with his "boys" and rob him.  Washington further testified that Thrower stated he was going to be his "next victim."  There was no objection to the admission of these statements.  Approximately an hour later, Thrower returned with three men.  Thrower chased Washington through the front door while Thrower's accomplices forcibly gained entry to the residence through the back door.

Harris testified that while Thrower had an AK-74 pointed at his head, Thrower yelled, "Kick the backdoor in."  Paxton objected to the statement on the grounds that it was hearsay. The trial court, however, admitted the statement under the co-conspirator exception, having determined there was prima facie evidence of an existing conspiracy.

-

Brinkley testified that when the three men kicked in the back door, he heard one say, "Get the money, get the drugs" and another say, "Oops, we're in the wrong house." Again, Paxton objected to the admission of the statements on the grounds that they were hearsay. The prosecutor argued that the statements were not hearsay because they were offered for the fact that they were said. He also argued, in the alternative, that if the statements were found to be hearsay, they were admissible as statements of co-conspirators. The trial court admitted the statements under the co-conspirator exception.

We conclude the statements were not hearsay. Hearsay is an out-of-court statement, offered in court to prove the truth of the matter asserted. Taylor v. Commonwealth, 28 Va. App. 1, 9, 502 S.E.2d 113, 117 (1998). "Testimony about another's statements is sometimes admitted to show the effect that the statement had upon a person who heard the statement. Such testimony is technically not hearsay, since the issue is not whether the statement was true, but what its effect was upon the person overhearing it." Charles Friend, The Law of Evidence in Virginia § 18-3 (5th ed. 1999).

The statements "Kick the backdoor in," "Get the money, get the drugs," and "Oops, we're in the wrong house," were not offered to prove the truth of the matters asserted. To the contrary, "Kick the backdoor in" was offered to show its effect on Paxton, Sally, and the unnamed individual as they gained

-

forced entry through the back door of the apartment. Thrower commanded the three men to gain entry to the apartment by yelling, "Kick the backdoor in." Immediately thereafter, gunshots were heard and someone kicked in the back door. The statement was not offered to prove the truth or falsity of the statement, but rather it was offered to show joint activity of those downstairs acting in response to Thrower's command.

Similarly, "Get the money, get the drugs" and "Oops, we're in the wrong house" were not hearsay because they were not offered to prove the truth of the matters asserted. To the contrary, when placed in context with the prior events and statements, it exemplifies the furtherance of their purpose to rob Washington. See Hamm v. Commonwealth, 16 Va. App. 150, 156, 428 S.E.2d 517, 521 (1993) ("If a statement is offered for any purpose other than to prove the truth or falsity of the contents of the statement, such as to explain the declarant's conduct or that of the person to whom it was made, it is not objectionable as hearsay."). We find no error in the admission of each of these statements. The trial court reached the right result for the wrong reason, and we will not disturb its judgment. Driscoll v. Commonwealth, 14 Va. App. 449, 452, 417 S.E.2d 312, 313 (1992).

-

III.  ACCESSORY-AFTER-THE-FACT INSTRUCTION

Paxton next argues that he was entitled to an accessory-after-the-fact instruction because his letter offered assistance to Thrower after the commission of the crimes.  We disagree.

"It is firmly established . . . that an accused cannot be convicted of a crime that has not been charged, unless the crime is a lesser-included offense of the crime charged." Commonwealth v. Dalton, 259 Va. 249, 253, 524 S.E.2d 860, 862 (2000); see also U.S. Const. amend. XIV; Va. Const. art. 1, § 8. Our Supreme Court determined that the crime of being an accessory after the fact is not a lesser-included offense of the crime of murder.

> There are three elements to the crime of being an accessory after the fact to a felony.  First, the felony must be complete. Second, the accused must know that the felon is guilty.  Third, the accused must receive, relieve, comfort, or assist the felon.  It is essential that the accused, at the time he assists or comforts the felon, has notice, direct or implied, that the felon committed the crime.  Manley v. Commonwealth, 222 Va. 642, 645, 283 S.E.2d 207, 208 (1981); Wren v. Commonwealth, 67 Va. (26 Gratt.) 952, 956 (1875).

> While convicting an accused of being an accessory after the fact requires proof that the accused provided assistance to a person with knowledge that the person was guilty of a completed felony, no such proof is required to convict an accused of murder. Thus, the crime of being an accessory after the fact contains an element that the crime of murder, the charged offense in the

-

present case, does not contain.  Therefore, the crime of being an accessory after the fact is not a lesser-included offense of the crime of murder.

Dalton, 259 Va. at 253-54, 524 S.E.2d at 862-63.

"[B]efore a defendant can be tried and convicted of being an accessory after the fact, he must be charged with that offense.  Unless such a charge is specifically made, neither the Commonwealth nor an accused is entitled to an accessory-after-the-fact instruction."  Id. at 255, 524 S.E.2d at 863.  Paxton was not charged with the crime of being an accessory after the fact to the crime of murder.  To the contrary, he was charged with first-degree murder.  Consequently, Paxton was not entitled to an accessory-after-the-fact instruction, and the trial court did not err in refusing to instruct the jury on that principle.

## IV.   CLARIFICATION OF JURY QUESTION

Paxton next argues that the trial court erred in not clarifying Instruction 7 regarding concert of action and Instruction 13 regarding principal in the second degree when the jury requested clarification.  We disagree.  Rule 5A:18 states in pertinent part:

> No ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice.

-

At trial, the jury asked the court to clarify Instructions 7 and 13.  When the court asked the Commonwealth and defense counsel if either objected to it telling the jury that the two instructions stated the law applicable to the case and to read them again carefully, Paxton's attorney unequivocally waived any objection.  He stated, "I don't have any objection."  He further informed the trial court that "any comment or editorial from counsel at this point would do more harm than good.  We've argued these instructions at length.  It's up to the jurors now to sort them out as best they can . . . ."

Paxton, therefore, waived any objection he may have possessed and is barred from raising this issue on appeal.  Moreover, the record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

## V.   SUFFICIENCY OF THE EVIDENCE

> When the sufficiency of the evidence is challenged on appeal, it is well established that we must view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.  The conviction will be disturbed only if plainly wrong or without evidence to support it.

Jones v. Commonwealth, 13 Va. App. 566, 572, 414 S.E.2d 193, 196 (1992).

Paxton argues lastly that the evidence was insufficient to convict him of the offenses for which he was charged.  He contends that there was no direct evidence to link him to the

-

crime committed.  From the evidence, the jury could properly infer that Paxton agreed to assist Thrower in the attempted robbery of Washington.

Concert of action is defined as

> an "action that has been planned, arranged, adjusted, agreed on and settled between the parties acting together pursuant to some design or scheme."  Rollston v. Commonwealth, 11 Va. App. 535, 542, 399 S.E.2d 823, 827 (1991) (quoting Black's Law Dictionary 262 (5th ed. 1979)).  All participants in such planned enterprises may be held accountable for incidental crimes committed by another participant during the enterprise even though not originally or specifically designed.

Berkeley v. Commonwealth, 19 Va. App. 279, 283, 451 S.E.2d 41, 43 (1994).  Thrower threatened to return to 3101 Garland Avenue with his "boys" and rob Washington.  Approximately an hour later, he returned with an AK-74 assault rifle and three accomplices.  Thrower entered the front of the house while the three accomplices forced entry into the rear of the house.  Gunfire erupted, wounding Brinkley and killing two-year-old Kayla.

Following the shootings, the police collected evidence from the crime scene as well as Thrower's vehicle.  Blood was discovered on the back porch of the apartment.  Additional blood was found on a rubber hose in the alleyway and on a Timberland boot located in Thrower's vehicle.  Paxton was treated at the hospital late that evening for a gunshot wound to his foot.

-

Despite denials, DNA analysis identified Paxton as the contributor of those blood samples, thus placing him on the back porch during the shooting as well as in Thrower's Cadillac.

In addition to the blood evidence, other evidence was also collected. The police conducted a gunshot residue test on Paxton and found primer residue on his hand. Furthermore, Paxton's own written statement placed him at the scene. A letter from Paxton, addressed to Thrower, was intercepted. The letter indicated that a witness had seen Paxton on the back porch during the shooting. As a result, he suggested testimony to explain the events of that evening.

Based on the evidence, the jury could conclude that Paxton agreed to assist Thrower in robbing Washington and was one of the men who entered the rear of the apartment during the shootings. Although the shootings may not have been part of the original plan, since Paxton participated in the planned enterprise he may be held accountable for the incidental crimes. Berkley, 19 Va. App. at 283, 451 S.E.2d at 43. Therefore, the evidence was sufficient to prove beyond a reasonable doubt that Paxton committed the charged offenses.

The judgment of the trial court is affirmed.

Affirmed.

-