COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Beales and Malveaux
Argued at Richmond, Virginia


ARIEN PRESCOTT POLLARD

v.        Record No. 1137-18-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY BENNETT MALVEAUX
JUNE 18, 2019


FROM THE CIRCUIT COURT OF APPOMATTOX COUNTY
S. Anderson Nelson, Judge

Kemper M. Beasley, III, for appellant.

Leah A. Darron, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Arien Prescott Pollard ("appellant") was convicted of grand larceny, in violation of Code

§ 18.2-95, and grand larceny of a firearm, in violation of Code § 18.2-95.[1]  On appeal, he argues

that the trial court erred in denying his motion to strike the second-charged larceny under the single

larceny doctrine.  For the following reasons, we affirm.

I.  BACKGROUND

On the evening of June 16, 2017, Elizabeth Iannaco and her boyfriend, Nathan Owen,

held a party at their residence, located on Old Grist Mill Road in Appomattox County.  About an

hour into the party, police arrived and told them to shut down the party, and they complied.

Everyone left except for a few friends.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant was also convicted of burglary, in violation of Code § 18.2-89, and robbery, in violation of Code § 18.2-58.  Appellant challenged these convictions in his petition for appeal to this Court.  This Court denied the assignment of error relating to the burglary and robbery convictions in a one-judge *per curiam* order.

About ten minutes after everyone had left, four individuals, later identified as appellant and his three codefendants, Tremaine Green, Tateana Wells,[2] and Octavius Wells, arrived at the home in a red Mitsubishi Lancer. They asked if they could stay because they had heard about a party happening, and Iannaco allowed them to stay.

Everyone "h[u]ng out for a little bit," with people coming in and out of the home. Approximately twenty to thirty minutes after appellant and his codefendants arrived, Iannaco went into her bedroom and saw that her PlayStation game console was missing. She told Owen about the missing item, and he asked each person if they had stolen the PlayStation. Appellant and each of his codefendants denied taking it.

After Iannaco saw that her PlayStation was missing, she was in the living room when she saw a gun and some bullets drop out of Tremaine Green's pocket. At that point, Owen asked everyone to go outside. He then brought a rifle he owned outside and showed it to Green. Green asked to hold the gun, and when Owen gave it to him, Green ran with it into the woods. Owen chased Green through the woods and eventually came in contact with him on the road. Green told him that the gun was in the car, so Owen searched the car. Owen did not find the gun, but he did find the missing PlayStation in the trunk.

When appellant and his codefendants came outside and asked Owen why he was looking in the trunk, he told them to "have a nice night," entered the house, locked the doors, and turned off the lights. Owen also retrieved his shotgun with which to defend himself because he knew that Green had a weapon. Appellant and his codefendants then got into their car and drove

---

[2] See Wells v. Commonwealth, No. 0896-18-2 (this day decided).

halfway down the driveway, but subsequently returned to the house.[3]  Once back at the house, one of the men went to the door and stated in a "very demanding" manner that he needed to get his phone.  He asked Owen and Iannaco to come outside and help look for it.  Owen told them that they did not have the phone and that they had called the police.  Appellant and his codefendants forced open the door and entered the house.  Tremaine Green was holding a pistol in his hand when he entered.

Owen and Iannaco were in the kitchen at that time.  Iannaco testified that the layout of the house was such that "when you walk in the door you walk into the living room, which is open and it flows right into the kitchen . . . [i]t's almost like one room."  When they entered the house, one of the individuals "ran" to Owen and took his shotgun from his person.[4]  After disarming Owen, appellant and her codefendants told everyone to get out of the house.  Owen went outside and ran into the woods.

Iannaco did not immediately go outside.  She first saw Tateana Wells take two PlayStation controllers, an Xbox One video game console with two controllers, about ten video games, and a television from the living room.  Tateana Wells made two or three trips to her car with the items.  Iannaco then went into her bedroom and saw a friend, Cash Neighbors, before she continued into the bathroom, which was located "right off [from] the bedroom."  At some point, Iannaco saw a man come into the bathroom.  He ordered her to go outside, and she did.  There, she ran into the woods and then watched appellant and his codefendants drive down and exit the driveway in the red Mitsubishi Lancer.

---

[3] Iannaco testified that they drove halfway down the driveway then drove back up to the house.  Cash Neighbors, who was inside the home with Owen and Iannaco, testified that they put the car in park halfway down the driveway, then got out of the car and walked back towards the house.

[4] Iannaco testified that Octavius Wells was the one who took the shotgun from Owen.  Owen testified that Tateana Wells took the shotgun from him.

Neighbors was in the kitchen with Iannaco and Owen when the door was forced open. He initially hid behind a corner, but at some point went into the bedroom and retrieved a rifle belonging to Owen from under the bed. He then went into the bathroom connected to the bedroom. Octavius Wells opened the bathroom door, saw that Neighbors had a rifle, and left the bedroom. Neighbors went back into the bedroom to "st[an]d his ground." Neighbors was alone in the bedroom at this point, but was then "disarmed" by either Octavius Wells or appellant when they entered the bedroom. After he was disarmed, Neighbors got into a fistfight with appellant and Wells. Tateana Wells and Tremaine Green came into the bedroom, and all four individuals "ganged up on" Neighbors and "beat [him] to the ground." They took Neighbors' phone and searched his pockets, and then started "beating" him again.

At the conclusion of the Commonwealth's case-in-chief, appellant moved to strike the evidence on the larceny of a firearm charge, arguing that the single larceny doctrine applied. The trial court denied the motion to strike, finding that "there were two separate and distinct times that this occurred." First, "[t]he shotgun . . . and the items in the living room were taken at one point." Then, "[t]here was an intervening time period" during which Iannaco and Cash went into the bathroom, and then the codefendants came in at "that time the gun was taken . . . [s]o that's two distinct actions."

Appellant was found guilty of grand larceny, in violation of Code § 18.2-95, and grand larceny of a firearm, in violation of Code § 18.2-95. This appeal followed.

## II. ANALYSIS

Appellant argues that the trial court erred in denying his motion to strike the grand larceny of a firearm offense because his actions constituted one larceny under the single larceny doctrine.

> Whether the larceny of multiple items at or about the same time
> from the same general location constitutes a single larceny or

- 4 -

> multiple offenses is an issue that most courts have addressed early in the development of their criminal jurisprudence. The concept is commonly referred to as the "single larceny doctrine." The principles are easily stated and understood, but application of the doctrine becomes problematic when applied to the infinite variety of circumstances that can arise.

Richardson v. Commonwealth, 25 Va. App. 491, 495 (1997) (*en banc*) (citation omitted). "The overriding principle behind the single larceny doctrine is to prevent the state from aggregating multiple criminal penalties for a single criminal act." Id. at 496. Accordingly, we have recognized that "[a] series of larcenous acts will be considered a single count of larceny if they are done pursuant to a single impulse and in execution of a general fraudulent scheme." Acey v. Commonwealth, 29 Va. App. 240, 247 (1999) (quoting West v. Commonwealth, 125 Va. 747, 754 (1919)). In determining whether this doctrine applies, we consider the following factors: "(1) the location of the items taken, (2) the lapse of time between the takings, (3) the general and specific intent of the taker, (4) the number of owners of the items taken and (5) whether intervening events occurred between the takings." Id. "The primary factor to be considered is the intent of the thief and the question to be asked is whether the thefts . . . were part of one impulse." Richardson, 25 Va. App. at 497. See also Millard v. Commonwealth, 34 Va. App. 202, 207 (2000) (noting that "multiple unlawful takings constitute separate larcenies if the thief acted upon a separate intent or impulse for each theft").

As the doctrine's applicability is dependent upon the specific facts of each case, and primarily upon the intent of the thief, this Court "will affirm the trial court's determination unless plainly wrong or unless the record lacks any evidence to support that determination." Bragg v. Commonwealth, 42 Va. App. 607, 612 (2004).

Appellant contends that the single larceny doctrine applies in this case because the two larcenies that occurred were part of the same act, were around the same time, and at the same location. Appellant relies on Acey to support his argument that the doctrine applies.

However, the facts in this case are distinguishable from Acey. In Acey, this Court held that the single larceny doctrine applied because the defendant took three firearms that were "within a few feet of each other" in the same room, and "[t]here was no appreciable lapse of time between the takings, only time enough for defendant to step from the closet, to the dresser and then to the headboard of the bed." Id. at 247-48. This Court further found that the "[d]efendant's intent . . . was to steal the weapons, but there [was] no indication he formed this intent separately for each item. Rather, his actions show he was motivated by one compulsion to steal." Id. at 248. This Court held that there were no "intervening events [that] took place between the takings." Id.

Here, the trial court found that one distinct larceny occurred when Tateana Wells removed electronics from the home, and the second distinct larceny occurred when appellant and Octavius Wells took the rifle from Neighbors in the bedroom. The evidence adduced at trial supports this finding. Although the two incidents occurred in the same house, they occurred in different rooms of the house, by different people, and at different times. Tateana Wells removed the video game items and television from the living room and left the residence several times to take the items to the car. Octavius Wells and appellant stayed in the residence and subsequently took the rifle from Neighbors. Thus, unlike Acey, there were "intervening events" that occurred between the two events. Furthermore, the trial court could reasonably infer that Tateana Wells' intent to steal the items from the living room was not the same intent as appellant's and Octavius Wells' intent to steal the rifle from Neighbors, especially so in this case because the thefts were

committed by different perpetrators against different victims.[5]  Therefore, we hold that contrary to appellant's arguments, the trial court did not err in rejecting the applicability of the single larceny doctrine and convicting him of grand larceny and grand larceny of a firearm.

### III.  CONCLUSION

We hold that trial court did not err in denying appellant's motion to strike the second-charged larceny because of the single larceny doctrine.  Accordingly, we affirm.

Affirmed.

---

[5] We note that appellant was guilty as a principal in the second degree of the larceny of the electronic items taken by Tateana Wells despite the fact that he did not actually remove the items from the house, based upon the concert of action doctrine.  See Rollston v. Commonwealth, 11 Va. App. 535, 543 (1991) ("[E]veryone connected with carrying out a common design to commit a criminal act is . . . bound by the act of any member of the combination, perpetrated in the prosecution of the common design.  But it is not necessary that the crime committed shall have been originally intended." (quoting Boggs v. Commonwealth, 153 Va. 828, 836 (1929))); see also Code § 18.2-18 (providing that one who acts as a principal in the second degree to a felony "may be indicted, tried, convicted[,] and punished in all respects as if a principal in the first degree").