COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judges Beales and White
Argued at Richmond, Virginia


DONALD RAY COMPTON, JR.

MEMORANDUM OPINION* BY
v.        Record No. 0502-21-2                    JUDGE RANDOLPH A. BEALES
                                                  OCTOBER 18, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

John D. Mayoras for appellant.

David M. Uberman, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Donald R. Compton, Jr., appeals an order of the Circuit Court of Spotsylvania County

convicting him of two counts of maliciously maiming the livestock of another, in violation of Code

§ 18.2-144, two counts of conspiring to maliciously maim the livestock of another, and one count of

possession of a firearm by a convicted felon, in violation of Code § 18.2-308.2.  On appeal, he

contends that the evidence was not sufficient to convict him of any of the offenses.

I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

(2016)).  So viewed, Halie Morgan owned two small goats and kept them on her property in

Spotsylvania County.  In May 2020, following several complaints from neighbors, Dena

Slingerland—a Code Enforcement Officer for the Spotsylvania County Zoning Office—informed

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Morgan that "the keeping of livestock is a non-permitted use" on her property, given its zoning. Slingerland instructed Morgan to promptly remove the goats from her property and offered her assistance in relocating the goats.

On June 18, 2020, C.P.,[1] Morgan's neighbor, saw Morgan and three men—later identified as Andrew Haefele, Donald Compton, and Charles McKinney—inside Morgan's goat pen. C.P. saw Haefele, swinging "what looked like a two-by-four with spikes wrapped around it" at the goats "as if it was a bat." She also observed Morgan order her two dogs to attack the goats and observed McKinney standing "a little further back."[2] C.P. testified that she saw a man in a blue shirt, later identified as Compton, recording the brutal attack on his cell phone. C.P. also recorded on her cell phone some of what she was viewing.

Another neighbor, M.J., also "heard a ruckus out back" and observed "someone swinging some sort of object" in Morgan's backyard. He reported the group's activities to "Spotsylvania County law enforcement," and a short time later, Deputy A. Mele of the Spotsylvania County Sheriff's Office arrived at Morgan's property. Deputy Mele spoke with McKinney and Compton and informed them that the Sheriff's Office had received a "complaint about the goats on the property being hit with possible sticks or poles." When the deputy asked them what had happened to the goats, McKinney claimed "[t]hat the goats had been picked up that morning" by a disposal company. The deputy then left without conducting a search of the property.

Deputy Mele then spoke with Morgan's neighbors. C.P. showed the deputy cell phone video footage that she had taken of what had just occurred with the goats. After viewing this footage, Deputy Mele became "worried that there were injured animals" in Morgan's backyard and

---

[1] We use initials for each of Morgan's neighbors in an effort to better protect their privacy.

[2] Later, C.P. saw McKinney carrying a hose, washing off the "two-by-fours," and placing pieces of "black tarp inside of the pen." She testified that "he seemed to be trying to cover things up."

returned to Morgan's property. The deputy spoke with Compton and McKinney again. Deputy Mele testified that "Donald Compton at this point had been noticed to be wearing the same shirt as one of the individuals that was on the video we viewed," causing the deputies to believe that Compton had participated in "this act that had occurred." Morgan eventually exited the house and told Deputy Mele that a disposal company had picked up the goats that morning. With Morgan's consent, however, deputies searched Morgan's property and "found two deceased goats" in two separate locations—each of which was covered.

A subsequent search of Compton's cell phone revealed several videos depicting the group's attack on the goats.[3] In one video, Haefele had armed himself with a "spiked mace," which is essentially a wooden club with metal spikes protruding from one end. He violently swung the weapon at one of the goats, but he missed the goat and struck a wooden structure instead. As the goat ran from Haefele, Compton exclaimed, "Strike one! That woulda taken its head right off, dude!" Haefele then instructed, "Hey, you know what, Donnie! Donnie, give me that goat feed right there." Compton reached for the bag of goat feed and handed Haefele the goat feed. Haefele then poured the goat feed onto the ground. As the goats ate, Haefele swung at and hit one of the goats with the spiked club, which caused both goats to flee.

Morgan suggested that they just let her dogs kill the goats instead, and, in response, Compton exclaimed, "That's awesome! That's Animal Cruelty 101!" As the dogs chased the goats, Haefele continued to move around the pen and hit the goats with the spiked club. When one of the goats ran into a child's playhouse, Compton offered Haefele his knife so that Haefele could "reach back and grab him [the goat] and slit his throat." At one point, Compton also instructed Haefele "to go after the weak one" and exclaimed that the goat had "too much pep left in his step."

---

[3] The Commonwealth entered three videos taken from Compton's cell phone into evidence at trial without objection.

He also exclaimed, "You traumatized them for life!" Throughout the attack on the goats, Compton made jokes and laughed about the goats' injuries and their suffering.

After several blows from the spiked club and several minutes of being chased by Morgan's dogs, Morgan lamented that the goats just would not die. Compton then said, "I got a twelve-gauge shotgun in there, I got a 1300 Winchester pump."[4] In a second video, McKinney grabbed one of the goats and slashed at the goat's neck with a machete,[5] killing the goat. In a third video, Haefele grabbed hold of the other goat, pinned it down, and repeatedly struck at the goat's neck with a machete. Compton told Haefele, "Saw at it, dude! It'll work!"

Haefele, Compton, McKinney, and Morgan were tried jointly in a bench trial on January 6, 2021. At trial, Dr. Jaime Weisman testified as an "expert in veterinary pathology and forensics." She testified that she performed a necropsy on the two goats. During the necropsies, she observed that one goat had "a minimum of four chop wounds to the neck and the head" and that the other goat had "a minimum of six chop wounds" to the neck and back of the head. She testified that "the chop wounds are gonna be the root cause" of the goats' deaths, but that she also found evidence of bleeding in the brain. She agreed that "[t]hese animals suffered" before they died.

The Commonwealth also called Dr. Lincoln Montgomery-Rodgers to testify as an expert in "livestock veterinary medicine." He testified that the American Veterinary Medical Association ("AVMA") "has extensive guidelines on what constitutes acceptable methods of

---

[4] The trial court found this voice to be Compton's based upon the proximity of the voice to the microphone, the "sound of the voice," and "the name of the person who was handling the camera." Later, a picture of a similar gun was retrieved from Compton's cell phone, and Deputy C. Brooks of the Spotsylvania County Sheriff's Office testified that "[t]here look[ed] to be no difference" between the gun pictured on Compton's cell phone and the Winchester 1300 Series 12-gauge, pump-action shotgun found in Morgan's residence.

[5] Upon review of the video recordings in the record, Haefele and McKinney appear to use a machete to hack at the goats' necks. At trial, Dr. Montgomery-Rodgers refers to the weapon as a "curved brush axe."

euthanasia for a variety of species." According to Dr. Montgomery-Rodgers's testimony, the AVMA specifically prohibits the use of "[b]lunt force trauma" on certain animals, such as cattle, sheep, and goats, "because of the thickness of the skull." He explained that these guidelines are also "used by the meat packing industry" to establish "what would constitute the least painful or most efficient way to dispatch an animal." He agreed that "a spiked mace" was not an acceptable way to kill a goat. In addition, he testified that "the most common method for at-home slaughter [of a goat] would be a gunshot to the head to render the animal unconscious, and then severing the jugular vein and carotid arteries with a sharp knife to exsanguinate the animal and actually kill him."

The trial judge convicted Compton of two counts of maliciously maiming the livestock of another (in violation of Code § 18.2-144), two counts of conspiring to maliciously maim the livestock of another, and one count of possession of a firearm by a convicted felon.[6] Compton now appeals to this Court.[7]

## II. ANALYSIS

On appeal, Compton raises three assignments of error. In his first assignment of error, he contends that "[t]he Trial Court erred in denying the Motion to Strike as to whether there was

---

[6] Compton had previously sustained felony convictions for possession of marijuana with intent to distribute and for manufacturing, selling, or distributing a Schedule I/II controlled substance.

[7] The trial court also convicted Haefele and McKinney of two counts of maliciously maiming the livestock of another and two counts of conspiracy. Haefele, Compton, and McKinney filed petitions for appeal to this Court, which this Court denied by orders dated October 21, 2021. Subsequently, Compton and Haefele filed a three-judge demand for a writ panel with this Court. On January 21, 2022, this Court granted Compton and Haefele their appeals pursuant to amendments to Code § 17.1-407 (effective January 1, 2022). McKinney chose to file a petition for appeal with the Supreme Court of Virginia, which the Supreme Court refused.

Morgan, as the owner of the animals, could not be convicted under Code § 18.2-144 and was instead convicted of two counts of misdemeanor animal cruelty—in violation of Code § 3.2-6570—and was sentenced to twelve months in jail for each conviction.

- 5 -

sufficient evidence as to the two (2) counts of Animal Maiming." In his second assignment of error, he contends that "[t]he Trial Court erred in denying the Motion to Strike as to whether there was sufficient evidence as to the [two] (2) counts of Conspiracy to Commit Maiming." Finally, in his third assignment of error, he contends that "[t]he Trial Court erred in denying the Motion to Strike as to whether there was sufficient evidence as to the one (1) count of Possession of a Firearm by a Convicted Felon."

When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Crowder v. Commonwealth*, 41 Va. App. 658, 663 (2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," *Riner v. Commonwealth*, 268 Va. 296, 330 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" *Crowder*, 41 Va. App. at 663 (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (*en banc*)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. To the extent that our analysis involves questions of law or statutory interpretation, we review such questions *de novo*. *Young v. Commonwealth*, 70 Va. App. 646, 652-53 (2019).

### A. Maliciously Maiming the Livestock of Another

### 1. Interpreting Code § 18.2-144

Compton contends that the evidence was insufficient to prove that he violated Code § 18.2-144. Specifically, he argues that the trial court should have included the phrase "against the will of the owner" into its reading of Code § 18.2-144—especially given that "[t]his code section

resides in Article 7 of Chapter 5 of [Title] 18.2, which deals with Damage to and Tampering with Property." He also argues that, since he acted as an agent of the owner, he did not commit a wrongful act and, therefore, the trial court could not find that he acted maliciously.

Compton's argument requires this Court to analyze Code § 18.2-144, which is a question of law which we review *de novo*. *See Young*, 70 Va. App. at 652-53. "When construing a statute, our primary objective is 'to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." *Blake v. Commonwealth*, 288 Va. 375, 381 (2014) (quoting *Cuccinelli v. Rector, Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). "[W]e must assume that 'the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words as we interpret the statute.'" *City of Va. Beach v. ESG Enters., Inc.*, 243 Va. 149, 153 (1992) (quoting *Barr v. Town & Country Props., Inc.*, 240 Va. 292, 295 (1990)). Consequently, we "apply[ ] the plain meaning of the words unless they are ambiguous or would lead to an absurd result." *Wright v. Commonwealth*, 278 Va. 754, 759 (2009) (citing *Washington v. Commonwealth*, 272 Va. 449, 455 (2006)).

Code § 18.2-144 provides, in relevant part,

> Except as otherwise provided for by law, *if any person maliciously shoot, stab, wound or otherwise cause bodily injury to*, or administer poison to or expose poison with intent that it be taken by, *any horse, mule, pony, cattle, swine or other livestock of another, with intent to maim, disfigure, disable or kill the same*, or if he do any of the foregoing acts to any animal of his own with intent to defraud any insurer thereof, *he shall be guilty of a Class 5 felony*.

(Emphasis added). In this case, the plain language of this statute required the Commonwealth to prove (1) that the accused shot, stabbed, wounded, or otherwise caused bodily injury to livestock; (2) that the accused acted maliciously; (3) that the accused intended to maim, disfigure, disable, or kill the livestock; and (4) that the livestock belonged to another person. *See id.*

- 7 -

Compton argues that the trial court "was in error in denying that, 'against the will of the owner' should be included in the reading of [Code §] 18.2-144." However, such limiting language is noticeably absent from the plain language of the statute. Consequently, adopting Compton's construction of this statute would require this Court to add words to the statute that the General Assembly did not include. "Where the General Assembly has expressed its intent in clear and unequivocal terms, it is not the province of the judiciary to add words to the statute or alter its plain meaning." *Hill v. Commonwealth*, 73 Va. App. 206, 213 (2021) (quoting *Jackson v. Fid. & Deposit Co. of Md.*, 269 Va. 303, 313 (2005)), *aff'd*, ___ Va. ___ (Aug 11, 2022). As the Supreme Court has directed, "Virginia courts 'presume that the legislature chose, with care, the words it used when it enacted the relevant statute.'" *Tvardek v. Powhatan Vill. Homeowners Ass'n, Inc.*, 291 Va. 269, 277 (2016) (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011)). "The act of choosing carefully some words necessarily implies others are *omitted with equal care*." *Rickman v. Commonwealth*, 294 Va. 531, 540 n.3 (2017) (emphasis added) (quoting *Cent. Va. Obstetrics & Gynecology Assocs., P.C. v. Whitfield*, 42 Va. App. 264, 280 (2004)). Therefore, the absence of language in the statute limiting the prohibited conduct to those who act against the will of the owner demonstrates that the General Assembly did not intend to include such words in Code § 18.2-144. *See Haba v. Commonwealth*, 73 Va. App. 277, 291 (2021) (holding that the absence of certain limiting language in a statute "signifies that the legislature did not intend to provide such limits").

Compton attempts to draw support for his construction of Code § 18.2-144 from the statute's location within the Virginia Code, which deals with "Damage to and Tampering with Property." However, this Court is bound by the words of the statute, not its heading or location within the Code. *See Jones v. Div. of Child Support Enf't on Behalf of Owens*, 19 Va. App. 184, 189 (1994) ("It is well-settled, however, that the words of the statute, not its heading, carry the

force of law." (citing *Ritholz v. Commonwealth*, 184 Va. 339, 367 (1945))). Furthermore, a review of other statutes within the same article of the Virginia Code reveals that the General Assembly chose to include, in some of those other statutes, express language criminalizing only those actions taken without the owner's consent. *See Haefele v. Commonwealth*, ___ Va. App. ___, ___ (Oct. 18, 2022) (this day decided). Clearly, if the General Assembly had wanted to include such language in Code § 18.2-144, it could have done so. Given that the General Assembly chose not to include such limiting language in this particular statute, we must presume that it did so intentionally. Consequently, the plain language of Code § 18.2-144 criminalizes all malicious maiming of the livestock of another person—regardless of whether the owner of the livestock actually authorized the malicious act.

Although Code § 18.2-144 contains no language limiting the prohibited conduct to those who act against the will of the owner, Compton contends that the fact that he acted with the owner's consent "negates the 'wrongful act' requirement of malice." Specifically, he argues that the "wrongful act" prohibited in Code § 18.2-144 is "a 'trespass' against the interests of the owner." However, Code § 18.2-144 is not a trespass statute because, as discussed *supra*, the statute does not criminalize only the unauthorized malicious wounding of the livestock of another—it criminalizes *all* malicious wounding of livestock by anyone but the owner.

Furthermore, consent does not necessarily negate malice. "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013) (footnote omitted) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed a purposeful and cruel act without any or without great provocation." *Synan v. Commonwealth*, 67 Va. App. 173, 187 (2017) (quoting *Robertson v. Commonwealth*, 31 Va. App. 814, 823 (2000)). "Malice may be

- 9 -

inferred from the 'deliberate use of a deadly weapon unless, from all the evidence, [there is] reasonable doubt as to whether malice existed.'" *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020) (alteration in original) (quoting *Strickler v. Commonwealth*, 241 Va. 482, 495 (1991)). As the Supreme Court has stated, "A 'common theme running through [the definitions of malice] is a requirement that a wrongful act be done wilfully or purposefully.'" *Avent v. Commonwealth*, 279 Va. 175, 202 (2010) (alteration in original) (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)).

Consequently, the trial court could infer malice from evidence that Compton and his associates "committed a purposeful and cruel act without any or without great provocation." *Synan*, 67 Va. App. at 187. The fact that Morgan may have given her permission for these men to maliciously beat and kill her goats does not somehow bestow upon their actions a veneer of legitimacy (e.g., just cause or excuse). *See Burkeen*, 286 Va. at 259. While an owner certainly may permit others to properly euthanize or slaughter her livestock, the owner does not have the right to permit another to torture, inhumanely injure, or cruelly beat her animals. *See* Code § 3.2-6570(A) (prohibiting the owner of an animal from permitting any person from torturing, inhumanely inflicting injury or pain, or cruelly or unnecessarily beating her animals and classifying a violation of this section as a Class 1 misdemeanor). Consequently, when the men here chose to brutally beat the goats with a spiked club before hacking them to death with a machete, they committed a wrongful and purposefully cruel act. Therefore, as a matter of law, the men here could be convicted of maliciously maiming the livestock of another, in violation of Code § 18.2-144—regardless of whether the owner authorized the malicious act.

## 2. A Principal in the Second Degree

Next, Compton contends that "the charges should have been struck because there was no evidence that Appellant ever touched or harmed either of the animals in any manner" and that

"[a]t most the evidence presented was that Appellant was filming the actions on a cell phone." The Commonwealth, however, does not need to show that Compton actually perpetrated the cruel and brutal attack against the goats himself (e.g., acted as principal in the first degree) in order for Compton to be convicted of the crime. The Commonwealth need only show that Compton acted as a principal in the second degree. *See* Code § 18.2-18 ("In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree.").

"A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)). "[M]ere presence and consent will not suffice" to render a defendant criminally liable as a principal in the second degree. *Rollston v. Commonwealth*, 11 Va. App. 535, 539 (1991). "The defendant's conduct must consist of 'inciting, encouraging, advising or assisting in the [crime].'" *Johnson v. Commonwealth*, 58 Va. App. 303, 318 (2011) (alteration in original) (quoting *Rollston*, 11 Va. App. at 539). The evidence must show that the defendant was not only present but that he "procured, encouraged, countenanced, or approved commission of the crime." *Augustine v. Commonwealth*, 226 Va. 120, 124 (1983). "Moreover, '[w]hen the alleged accomplice is actually present and performs overt acts of assistance or encouragement, he has communicated to the perpetrator his willingness to have the crime proceed and has demonstrated that he shares the criminal intent of the perpetrator.'" *Johnson*, 58 Va. App. at 319 (quoting *Rollston*, 11 Va. App. at 539).

Here, the record—including the video evidence—demonstrates that Compton willingly participated in the group's malicious beating, abuse, and killing of two small, defenseless goats. *See Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022) ("[W]e, on appellate review, view

- 11 -

video evidence . . . for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did."). Compton filmed the brutal attack on his cell phone—starting the recording before Haefele swung his first blow until after the killing of the goats occurred. When Haefele asked Compton to hand him goat feed, Compton readily complied—overtly aiding Haefele in his attempt to lure the goats toward Haefele to make it easier to hit them with the spiked club. *See id.*

Furthermore, through the entire video of the brutal attack, the voice closest to the phone—which the trial court implicitly found to be Compton's voice (given that he was holding the phone)—can be heard laughing, joking, and otherwise encouraging Haefele's brutal attack. *See Augustine*, 226 Va. at 124. After Haefele's first swing (and miss), Compton yelled, "Strike one! That woulda taken its head right off, dude!" When Morgan suggested that they let the dogs kill them, Compton exclaimed, "That's awesome! That's Animal Cruelty 101!" Then, while the dogs chased the goats, Compton told Haefele to "go after the weak one." After one of the goats hid in a child's playhouse, out of the reach of Haefele's spiked club, Compton suggested Haefele use a knife to slit its throat. Given all of the evidence in the record, we certainly cannot say that no rational factfinder could conclude that Compton performed overt acts of assistance (e.g., handing Haefele the goat feed) in the malicious beating and killing of Morgan's goats—and could conclude that Compton encouraged the perpetrators in their cruel acts such that he shared a criminal intent with Haefele and McKinney. *See id.*

Given that Compton could be convicted under Code § 18.2-144 despite having the owner's permission to maliciously kill the goats and given that the evidence supports the conclusion that Compton acted as a principal in the second degree, we affirm Compton's convictions for maliciously maiming the livestock of another.

## B. Conspiring to Maliciously Maim the Livestock of Another

Compton contends that the evidence was insufficient to sustain his convictions for conspiring to maliciously maim the livestock of another because he could not have been properly charged under Code § 18.2-144 because he (and Haefele and McKinney) were acting "per the wishes of the owner" of the goats. Given that a rational factfinder could certainly convict Compton under Code § 18.2-144, *as noted supra*, Compton's only argument in support of his second assignment of error fails, and we uphold the trial court's convictions of Compton for conspiring to maliciously maim the livestock of another.

## C. Possession of a Firearm by a Convicted Felon

Finally, Compton contends that the evidence was insufficient to sustain his conviction for possession of a firearm by a convicted felon. Specifically, Compton argues that the Commonwealth failed to prove he actually or constructively possessed the Winchester 1300 Series 12-gauge, pump-action shotgun found in Morgan's home. Code § 18.2-308.2 prohibits "any person who has been convicted of a felony" from "knowingly and intentionally possess[ing] or transport[ing] any firearm . . . ." "Possession of a firearm may be actual or constructive." *Hall v. Commonwealth*, 69 Va. App. 437, 448 (2018).

> To establish constructive possession of the firearm by a defendant, "the Commonwealth must present evidence of acts, statements, or conduct by the defendant or other facts and circumstances proving that the defendant was aware of the presence and character of the firearm and that the firearm was subject to his dominion and control."

*Bolden v. Commonwealth*, 275 Va. 144, 148 (2008) (quoting *Rawls v. Commonwealth*, 272 Va. 334, 349 (2006)).

Here, Compton, a convicted felon, can be heard on the video offering to retrieve *his* firearm to kill the goats and describing that firearm in detail. He stated, "I got a twelve-gauge shotgun in there, I got a 1300 Winchester pump." The shotgun that the sheriff's deputies found when they

- 13 -

searched the house exactly matched the description that Compton gave of his firearm—a Winchester 1300 Series 12-gauge, pump-action shotgun. Furthermore, when the sheriff's deputies later searched Compton's phone, they found a picture of an identical firearm on his phone. Although the shotgun was not found on his own property, Compton's statements along with the other evidence show that he certainly had access to the shotgun and that it was subject to his dominion and control. *See id.* Given the evidence in the record, a rational factfinder certainly could conclude that Compton possessed the Winchester 1300 Series 12-gauge, pump-action shotgun found in the house on the property where the goats were killed. Therefore, we affirm Compton's conviction for possession of a firearm by a convicted felon.

### III. CONCLUSION

In short, we hold that a rational factfinder could certainly find the evidence sufficient to convict Compton of maliciously maiming the livestock of another under Code § 18.2-144 as a principal in the second degree and that he shared a criminal intent with Haefele and McKinney. Here, Compton rendered assistance to Haefele by handing him goat feed so that Haefele could lure the goats to him, recorded the attack on his cell phone, and gleefully encouraged the perpetrators in their brutal attack by not only making suggestions for it but also laughingly encouraging their cruel attack on the small goats. Therefore, we uphold Compton's convictions for maliciously maiming the livestock of another. Furthermore, given that the trial court did not err in convicting Compton under Code § 18.2-144, Compton's only argument in support of his second assignment of error is without merit, and we also affirm Compton's convictions for conspiring to maliciously maim the livestock of another.

Finally, we also cannot say that no rational factfinder could have found the evidence sufficient to conclude that Compton possessed the Winchester 1300 Series 12-gauge, pump-action shotgun that the deputies found on the premises. Compton's statements captured on

- 14 -

video show that he was aware of the presence and character of the shotgun and that he exercised dominion and control over it. He described the shotgun in detail, referred to it as his shotgun, and offered to retrieve his firearm from the house in order to kill the goats. Consequently, we also uphold Compton's conviction for possession of a firearm by a convicted felon.

*Affirmed.*